Mathilde B. Hooper, Administratrix of the Estate of James P. Hooper, Deceased, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 85776. Promulgated January 19, 1940.

---

*J. Warren Brock, Esq.*, and *George B. Clothier, Esq.*, for the petitioner.

*A. W. Carnduff, Esq.*, for the respondent.

OPINION.

Mellott: The following schedule shows the respondent's method of computing the net estate under the 1932 Act:

Gross Estate Returned_____ $50, 680. 00
Add:
    (a) Property as to which there is no controversy over value____   3, 142. 37
    (b) Proceeds of life insurance policies_____ 132, 639. 31
    (c) Value of 3,613 shares of William E. Hooper & Sons Co.
         stock at $100 per share_____. _____ 361, 300. 00

            Total gross estate_____ 547, 761. 68
Deductions allowable _____ 279, 131. 92

Taxable Net Estate_____ 268, 629.76

Petitioner contends that none of the property added by the respondent is includable in gross estate; that in any event the value of the 3,613 shares of stock is so much less than that determined by him that there is no taxable net estate; that the proceeds of the life insurance policies are not includable, since the trust was the beneficiary and received the proceeds; and that, even if the insurance proceeds are includable, $40,000 of the amount received should nevertheless be excluded from gross estate under section 302 (g) of the Revenue Act of 1926.

It has been found as a fact that the stock had a value of $45 per share ($162,585). The evidence upon which this finding is based

will be discussed later. It is apparent that there will be a small deficiency in tax if the property in issue be included in gross estate, so it is necessary that all of petitioner's contentions and alternative contentions be considered.

We shall first consider whether or not the assets of the trust estate are includable in the gross estate of decedent. The applicable statute is section 302 (c) of the Revenue Act of 1926, as amended by the Joint Resolution of March 3, 1931, shown in the margin.[1] The portion shown in italics was added by the joint resolution.

A history of the legislation is shown in *Hassett* v. *Welch*, 303 U. S. 303. In *Helvering* v. *Bullard*, 303 U. S. 297, decided the same day, the Supreme Court approved the inclusion, in the gross estate of the decedent, of property which she had conveyed to a trust, reserving to herself a life interest in the income. (See *Sellar Bullard, Executor*, 34 B. T. A. 243, for a further statement of the facts.) A similar holding was made by this Board in *E. Pennington Pearson, Executor*, 36 B. T. A. 5.

The cited cases point the way to a solution of the question before us, though the facts are not identical with those of the instant proceeding. The transfer by the decedent was not made "in contemplation of death" as such phrase was construed by the Supreme Court in *United States* v. *Wells*, 283 U. S. 102. At the conclusion of the evidence counsel for the respondent conceded as much and the question is not discussed upon brief. He relies upon the first portion added to the statute by the Joint Resolution of March 3, 1931—that the transfer was one "under which the transferor has retained for his life or any period not ending before his death, the possession or enjoyment of, or the income from, the property." In this connection he says: "It is unquestionably true that the income of this trust was intended to, and did in fact, inure to the benefit of the grantor."

Petitioner, inferentially conceding that the income did inure to the benefit of the grantor, argues that during his life the benefits were "indirect"; that he did not retain "the possession or enjoyment of, or the income from, the property"; that a holding to the effect such rights were retained can only be reached by applying the rationale of *Douglas* v. *Willcuts*, 296 U. S. 1, and kindred cases; that

---

[1] The value of the gross estate of the decedent shall be determined by including the value *of the time of his death of all* property, real or personal, tangible or intangible, wherever situated * * *

"(c) To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, in contemplation of or intended to take effect in possession or enjoyment at or after his death, *including a transfer under which the transferor has retained for his life or any period not ending before his death (1) the possession or enjoyment of, or the income from, the property or (2) the right to designate the persons who shall possess or enjoy the property or the income therefrom;* except in case of a bona fide sale for an adequate and full consideration in money or money's worth." 46 Stat. 1516.

it is an artificial rule to be applied only in income tax cases; and that this Board has previously taken the position, in *Estate of Paul F. Donnelly*, 38 B. T. A. 1234 (appeal pending C. C. A., 8th Cir.), that it can not, and will not, be applied, in estate tax cases.

In the case relied upon by petitioner it was pointed out that an estate tax controversy "must be decided under the specific provisions of section 302 (c) as amended, rather than upon any analogy from income tax cases [and that] the language of the statute does not clearly indicate that it was intended to apply to a situation like" the one then before the Board. Holding that the settlor had "retained no right to receive the income, and any enjoyment of the property or right to the income from the property came to him in a very indirect manner, if at all", it was stated: "*The use of the income was not limited to the discharge of his legal obligations.*"

In the instant proceeding, however, the use of the income of the trust was, for all practical purposes, limited to the discharge of the settlor's legal obligations. He had a legal and moral obligation to provide for the support of his family, including the maintenance, education, and support of his children. This obligation was cast upon the trust. The trust instrument directed that 36 percent of the gross income of the trust, but not to exceed $16,000 nor to be less than $14,000 per annum, be paid over to the wife "for the upkeep and maintenance of the property" owned and occupied by her and the settlor and that "the entire cost of maintaining, educating and supporting" their children, "together with all household and living expenses" be paid by her. The next obligation of the trust was to give effect to the settlor's expressed wish that sufficient insurance upon his life be kept in force so that "the ultimate payment of the principal of the debts listed on Schedules A and B shall be protected so far as possible." The third obligation of the trust was to pay "from time to time pro rata on account of the principal of the indebtedness due" by the settlor.

The income of the trust was applied as directed. The settlor's salary from William E. Hooper & Sons Co., which was apparently $45,000 per annum, was paid to the trustee in the aggregate amount of $49,563. (Cf. *Lucas* v. *Earl*, 281 U. S. 111). Other income of the trust was nominal, amounting to less than $1,800. However, it withdrew the cash surrender value of certain insurance policies, amounting to $23,692.47, so that its receipts, during the time which elapsed between its creation and the death of the decedent, amounted to approximately $78,000. During the same period it distributed to the wife $22,275, which she used as directed, paid $48,093.30 to the settlor's creditors, used $2,934.09 for "other payments" (not otherwise identified in the evidence), and paid $5,190.65 as premiums upon his life insurance.

After the death of the decedent the trustee paid the creditors listed in the schedules attached to the trust instrument the aggregate amount of $118,255.44. The obligation so liquidated constituted part of the deductions claimed by petitioner in schedules I and J of the estate tax return and have been allowed by the respondent. Summarizing, we think it can not be gainsaid that the income of the trust created by this decedent was used for the discharge of his legal obligations; and a practical interpretation of the terms of the trust instrument leads to the conclusion that no other application could have been made of such income, at least until the full amount of the indebtedness had been paid. The *Donnelly* case, *supra*, is therefore distinguishable upon its facts.

The transfer by the decedent seems to have been, and we hold that it was, one under which he "retained for his life or any period not ending before his death, the possession or enjoyment of, or the income from, the property." It follows that the respondent did not err in including the value of the property transferred in his gross estate.

Petitioner argues that even if the value of the stock must be included in gross estate the proceeds of the life insurance policies need not be. She cites section 302 (g) of the Revenue Act of 1926,[2] as supporting not only this contention but her alternative one that, in any event, she is entitled to the $40,000 exclusion referred to in the last sentence of the section.

Respondent relies upon the same section and upon his regulation (art. 26, Regulations 80) interpreting it.[3] He quotes from the Board's decision in *Marmaduke B. Morton, Administrator*, 23 B. T. A. 236, as follows:

* * * It, therefore, seems clear to us that Congress, in enacting section 302 of the Revenue Act of 1924, intended that there should be included in the gross estate of a decedent the full amount of his life insurance which after his death is subject to the payment of charges against his estate * * *, and that it was not the intention of Congress in enacting subdivision (g) of that section to exempt from taxation life insurance meeting such tests, although in terms payable to someone other than the executor. * * *

Since the filing of briefs we have had occasion to consider somewhat the same question as that now before us in *Pacific National*

---

[2] SEC. 302. The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated—

* * * * * * *

(g) To the extent of the amount receivable by the executor as insurance under policies taken out by the decedent upon his own life; and to the extent of the excess over $40,000 of the amount receivable by all other beneficiaries as insurance under policies taken out by the decedent upon his own life.

[3] ART. 26. *Insurance in favor of the estate.*—The provisions requiring the inclusion in the gross estate of all insurance receivable by the executor, without any exemption, applies to * * * all insurance which is in fact receivable by, or for the benefit of, the estate. * * *

*Bank of Seattle, Executor*, 40 B. T. A. 128, and *Estate of Waldo Rohnert*, 40 B. T. A. 1319. In the former case we held that proceeds of insurance, though payable to a trustee, to the extent that they were required to be used in liquidating debts or obligations of the estate, must be included in gross estate under 302 (g) and that the $40,000 exclusion could not be applied against the amount so used. In the latter case we held that, notwithstanding the fact all of the proceeds of insurance could have been used, if necessary, to pay charges against the estate, there should be included in gross estate only the amount actually used, the $40,000 exclusion to be applied to the remainder. Upon the authority of these cases we therefore hold that $118,255.44 of the proceeds of the life insurance policies should be included in gross estate. The remainder of the amount received ($132,636.31–$118,255.44), being less than $40,000, may not be included.

In arriving at a value of $45 per share for the William E. Hooper & Sons Co. stock, we have considered the stipulated facts, the testimony of three witnesses presented as experts by petitioner, and all other evidence bearing upon the question. No witnesses testified as experts in behalf of respondent.

All of the witnesses for petitioner were qualified to express opinions as to the value of the stock on the basic date, i. e., August 3, 1933. One testified that it was not in excess of $20 per share; another testified to a value of between $10 and $20 a share, "nearer ten than twenty"; while the third arrived at a value of between $15 and $25, and stated "it would work out under twenty." From their testimony it appears that they considered, among other things, the record of earnings, not only of the company itself, but also of its selling agent, the Hooper Sons Manufacturing Co., for the years 1926 to 1931, inclusive, prior to the merger of these companies, and for the years 1932 and 1933, after the merger; the book value of the stock; the cash dividend record of the two companies; the impairment of the surplus account by losses of the business, and the maintenance of this account by transfers from depreciation reserves; the ratio of current assets to current liabilities; absence of any regular or established market for the stock; the fact that 3,613 shares constituted a minority interest; unsettled business conditions owing to the depression and other factors, and the availability of other more desirable stocks at low prices.

In support of his contention that the stock had a fair market value of $100 per share on August 3, 1933, respondent points to its book value of approximately $145 per share; earnings of $11 per share in 1933 and approximately $10 per share in 1934; a definite upswing in the industry at the end of the month preceding the date of valuation; an entry on the books of the corporation of $8,570 as the

"excess of par value over cost of 306 shares of the corporate capital stock cancelled during 1932"; the issuance by the corporation in 1932 of 340 shares at par; and evidence indicating that there were several interfamily transactions in the stock prior and subsequent to the decedent's death.

The only evidence of interfamily transactions in the stock is contained in the testimony of petitioner's witnesses. Two of the witnesses, who were called by the petitioner as experts, were asked by respondent's counsel on cross-examination if they knew of sales made by the decedent to members of his family prior to his death of small amounts of the stock for $90 and $100 per share. Neither of them had any personal knowledge of such sales, although one testified he had been told that sales at $65 and $90 per share had been made. The secretary and assistant treasurer of the company, who is also the trustee under the trust, testified that some time prior to 1926 decedent had borrowed money from his two sisters and had given each of them 70 shares of the stock as collateral, based on $90 a share, with a privilege of buying it back from them at that price. Subsequently there was a stock dividend and the two sisters each received a certificate for 97 shares for the 70 shares so that they then had in the place of 70 shares at $90 a share, 97 shares at $65 a share. When on January 26, 1932, decedent's brother, Robert, acquired an option to purchase for $65 a share 150 shares of the Hooper Co. stock from the trustee, the price he agreed to pay was based upon that used in the previous transaction between the decedent and his sisters. No effort was made to base the option price on the fair market value of the stock as of the date of the option agreement. Robert Hooper testified that he never exercised the option prior to the decedent's death because he did not consider that the stock was worth $65 a share. After the decedent's death the trustee was in financial difficulties and asked Robert to purchase 20 shares at $65 so that he might have some funds to run the estate. Robert did so, but he testified that it was only as an accommodation to the trustee. Interfamily transactions, such as those described above, are entitled to little, if any, weight in determining the fair market value of the stock on the basic date.

While it is true that two of petitioner's exhibits indicate that 340 shares of the stock were issued at par in 1932 and that an entry was made in that year indicating that the company had acquired 306 shares of its stock at $71 per share, or $8,570 less than the par value of these shares, the facts and circumstances surrounding these transactions are not disclosed. In our opinion, however, they are not indicative of the price a willing buyer and seller would agree upon for 3,613 shares on August 3, 1933, but were bookkeeping adjust-

ments in connection with the merger of the parent company and its subsidiary selling agent.

A study of all of the evidence convinces us that there were no actual sales of the stock to serve as a basis for determining what a willing buyer and a willing seller would agree upon as a fair price. In the absence of sales, the material factors to be considered in determining the fair market value of the stock of a close corporation, such as we are now dealing with, are: earning capacity and anticipated profits; book value; dividend yields; and such other facts and circumstances surrounding the corporation and its business as would be considered by a prospective buyer and seller. A prospective buyer would give some consideration to the book value of $145 a share. He would realize, however, that the company was a going concern, and that, even if it be assumed that the book value could be realized upon the liquidation of the corporation, there was no indication that it was to be liquidated. Moreover, he would also realize that "minority stock interests in a 'closed' corporation are usually worth much less than the proportionate share of the assets to which they attach." *Cravens* v. *Welch*, 10 Fed. Supp. 94. In our opinion, the factor which he would consider as the most important would be what the stock would earn. See *Borg* v. *International Silver Co.*, 11 Fed. (2d) 147.

The evidence discloses that the company had a poor earnings record. In 1932 it operated at a loss of $165,404, and its total net loss for the period 1926 to 1932 (including the profit and loss of its selling agent prior to January 1, 1932, the effective date of the merger) was $59,683, or a loss of $5.77 per share. In March 1933, after the bank holiday, its business increased; and on August 3, 1933, it could reasonably have been anticipated that it would realize, and it did realize, a substantial profit for the year. The testimony of petitioner's witnesses convinces us, however, that the increase in business and profits following the bank holiday in 1933 was largely due to fear of a violent sudden inflation, and to the rise in the prices of raw materials when the country went off the gold standard. It therefore was not a true indication of what might be expected in the future.

The cash dividend record of the company and its subsidiary combined for the period 1926 to 1932, inclusive, was $143,250, or only about $2 per share per annum; but even this rate was not justified by the earnings of the seven year period, in view of the net loss referred to above. The company's surplus account, which had been impaired by the losses of the business, was maintained by the transfer from its depreciation reserve of $138,870 in 1926, $117,348 in 1928, and $350,000 in 1932. At the end of the year 1932 the company's current assets amounted to $587,792 and its current liabilities, which

consisted almost entirely of notes payable to banks, amounted to $437,205.

The witnesses who expressed opinions as to the value of the stock on the basic date testified that they had considered all of the facts to which reference has just been made. They concluded that the value was between $15 and $25 per share. This estimate seems to us to be entirely too low. But the value placed upon it by the Commissioner in his determination is much too high. Our duty—difficult as it is—is to determine a *fair* market value. We have tried to do so and have determined it to be $45 per share. This figure happens to be the same as that used by the petitioner when she filed the estate return, before any controversy had arisen. We accept it, not because of that fact, but because we believe it to be about what a buyer, willing, but not compelled to buy, would pay and a seller, willing, but not compelled to sell, would accept, both having reasonable knoweldge of all the facts.

We compute the net estate as follows:

| | | |
|---|---|---:|
| Gross estate returned | | $50, 680. 00 |
| Add: | | |
| | (a) Property transferred to the trust, no controversy as to value_ | 3, 142. 37 |
| | (b) Value of 3,613 shares of stock at $45 per share | 162, 585. 00 |
| | (c) Proceeds of life insurance | 118, 255. 44 |
| Gross estate | | 334, 662. 81 |
| Deductions (1926 Act) | | 329, 131. 92 |
| Net estate (1926 Act) | | 5, 530. 89 |
| Net estate (1932 Act) | | 55, 530. 89 |

Deficiency shall be recomputed in accordance with the views herein expressed and,

*Decision will be entered under Rule 50.*