Estate of James D. McDermott, Deceased, John Lawrence McDermott and Maude E. McDermott, Co-Executors v. Commissioner.
Estate of James D. McDermott v. Commissioner
Docket No. 31207.
United States Tax Court
1953 Tax Ct. Memo LEXIS 272; 12 T.C.M. (CCH) 481; T.C.M. (RIA) 53154; April 30, 1953
Allin H. Pierce, Esq., for the petitioner. Julian L. Berman, Esq., and John E. Owens, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: Respondent determined *273 a deficiency in petitioner's estate tax of $86,228.80. Petitioner claims an overpayment. The issues for our decision are: 1. What was the fair market value, on the optional valuation date of April 22, 1948, of property belonging to petitioner as follows: (a) 1,273 shares of stock of the Olympic Commissary Company; (b) certain improved real estate which was decedent's home when he died? 2. Are the assets of the eight inter-vivos trusts created by decedent for the benefit of his wife and seven children in 1939 includible in the gross estate of decedent: (a) under section 811 (c) (1) (B), I.R.C., and or (b) under section 811 (d), and (c) if so, at what value? It was stipulated by the parties that they would later agree as to the amount of attorneys' fees, court costs, administrative expenses, inheritance and other taxes due the State of Illinois, etc., which are deductible, and that same would be computed under Rule 50. Findings of Fact James D. McDermott, hereinafter called decedent, was born August 5, 1879, and died testate, a resident of Bannockburn, Lake County, Illinois, on April 22, 1947. John Lawrence McDermott, his son, and Maude E. McDermott, *274 his widow, were duly appointed as executors of his estate and filed an estate tax return with the collector of internal revenue for the first district of Illinois at Chicago, on August 20, 1948. This return showed the total amount of estate tax due to be $40,622.50, which sum was paid by petitioner in February, 1949, prior to the mailing of the deficiency notice. Petitioner elected to value the gross estate as of April 22, 1948, one year from the date of death. Among other property owned by decedent at his death, and owned by his estate on April 22, 1948, was (a) 1,273 shares of common stock of Olympic Commissary Company, an Illinois corporation, hereinafter called Olympic, and (b) eight acres of land, together with the residence and other improvements thereon, located in Bannockburn, a village of 400 population, some 20 miles from Chicago, and hereinafter called decedent's residence. Olympic was incorporated in 1927 to take over a business operated by decedent since 1918. Its outstanding stock since 1934 consists of 2,250 shares of common, all owned by decedent and his family. Olympic is the parent of a wholly owned subsidiary corporation, Omaha Boarding Company, hereinafter called *275 Omaha, incorporated in 1939. The stock of Olympic and Omaha was not listed on any stock exchange and no shares in either were ever traded or sold. The principal business of Olympic has always been that of supplying board and lodging, under contract, to track laborers and other employees of the Chicago, Milwaukee & St. Paul Railroad, hereinafter called the Milwaukee Road. Omaha's business, on a smaller scale, has been primarily the same, except its contract was with the Elgin and the Chicago & Alton Railroads. The railroads paid Olympic and Omaha a fixed amount for each worker, which was called the board rate. Olympic operated mobile camps for track crews consisting of box cars, etc., that had been converted to provide sleeping quarters, dining and kitchen facilities. These mobile camps, at some times 40 or 50 in number, were moved, after a temporary stay of a week or more, to other locations. The railroad provided the cars and Olympic the bedding, kitchen equipment, food and services. At these camps Olympic also operated commissary stores where it sold tobacco, candy, etc. Under the railroad contracts both Olympic and Omaha also operated permanent lunch rooms, dormitories, etc. *276 , in principal railroad centers for use of railroad employees. During war years Olympic also operated labor boarding camps in a number of states, under contracts with DuPont and other companies having government contracts, and also commissaries where it kept substantial sums of money to cash workers' pay checks. Decedent was president, managing head and producer of Olympic business. He was a hard worker, of limited eduction, but a good business executive. He had been associted with the Milwaukee Road since 1909, when he undertook the recruiting and hiring of track laborers, and in 1918 acquired his first contract from the road to board and lodge its laborers, and was always highly regarded by the road. He also had the confidence of the chief engineer of the DuPont Company. In 1942 Olympic began to suffer losses from its railroad operations. Prices and operating expenses were increasing and the number of railroad maintenance men which it boarded was declining, due to the introduction of labor-saving machinery, the use of track materials which had longer life and the employment by the railroad of more local men who lived in their own homes. The Olympic's bank balances at its various *277 banks declined to where it could not meet its current obligations. In 1943 decedent advanced $40,000 to Olympic out of his own funds. From November, 1943, to January, 1944, there were repeated overdrafts at its banks, and appeal was made to the Milwaukee Road for help, and in December, 1943, the road made a new agreement with Olympic by which it provided for reimbursement by the railroad of certain losses, retroactive to cover 1943, as the road realized it would be difficult to secure a contractor to take the place of Olympic. Under the new contract reimbursements of losses were paid by Milwaukee to Olympic in these amounts: 1943, $166,086; 1944, $366,490; 1945, $555,614; and 1946, $433,295. In March, 1947, Milwaukee Road again revised its contract with Olympic and eliminated all provisions for reimbursement of losses, but increased the per diem rate for boarding track crews to $2.25 and reserved the right to terminate it on written notice. Under this March 1, 1947, contract executed by decedent for Olympic just before his death, Olympic continued to lose money, and in August, 1947, John Lawrence McDermott, successor to his father as president, wrote the Milwaukee Road that unless *278 relief was granted "Olympic will soon be insolvent". Thereupon Milwaukee, having doubt as to young McDermott's ability to carry on, considered taking over the camp operations itself, but after investigation decided not to do so, and on November 24, 1947, executed a new contract with Olympic, dated July 1, 1947, but retroactive to March 1, 1947, whereby it continued the per diem of $2.25 per person, but eliminated the provision for employment offices and agreed to compensate Olympic for its 1947 losses and thereafter paid Olympic $84,421.65 for such losses. This contract provided for immediate termination by either party, and Milwaukee, in its letter of transmittal, gave notice that it would not, after 1947, make good any Olympic losses. In each of the years 1945, 1946 and 1947 over 95 per cent of Olympic's gross income came from its contracts with the Milwaukee Road. In September 1948 decedent's executors sought a $40,000 loan from a Chicago bank to pay taxes, and offered petitioner's 1,273 shares of Olympic as collateral, but the bank refused same on the ground that the stock was not good collateral, due to its nonmarketability and nondividend paying record. Its last dividend *279 was paid in 1939. Later the same bank refused a $15,000 loan with the same collateral on the same ground. Since 1927 all salaried officers of Olympic have been members of the McDermott family. Both Olympic and Omaha are going concerns and liquidation has not been considered. The consolidated balance sheet of the Olympic and Omaha Companies as of December 31, 1947, was substantially as follows: ASSETS
Cash in banks, offices and camps
$205,453
U.S. Savings Bond
1,000
Accounts receivable
235,421
Inventories - Stores & Commissary
52,013
Other assets, including net depreciable
items
122,969
Total Assets
$616,856
LIABILITIES
Accounts payable
$ 89,316
Federal taxes withheld
3,570
Due officers and employees
13,211
Accruals
51,865
Capital stock
225,000
Surplus
233,894
Total Liabilities & Capital
$616,856
An analysis of Olympic's net profits or losses for the years 1938-1947, before Federal taxes, is as follows: Additional Losses
Net Profit
Balance
from Railroad
Total Net Income
(or Loss)
Attributable
Camps, which were
(or Loss)
from other than
to Railroad
reimbursed by
Year
before Taxes
Railroad Camps
Camps
Milwaukee Road
1938
$ 14,692
$ (4,302)
$ 18,994
1939
109,400
788
108,612
1940
3,343
(1,420)
4,763
1941
11,627
17,768
(6,141)
1942
(19,671)
47,870
(67,541)
1943
101,434
145,770
(44,336)
$166,086
1944
122,123
92,658
29,465
366,491
1945
(20,993)
29,591
(50,584)
555,615
1946
26,487
82,038
(55,551)
443,275
1947
(21,416)
9,704
(31,120)
84,422
*280 The net incomes or losses of Olympic and of Omaha, after Federal taxes (and after giving effect to partial reimbursements of losses), and also the consolidated gross sales and net incomes of these companies, for the years 1933-1947, were: OLYMPIC
OMAHA
CONSOLIDATED
Net Income
Net Income
or Loss
or Loss
Gross
Net Income
Year
After Taxes
After Taxes
Sales
After Taxes
1933
$ (16,687)
$ 232,790
$ (16,687)
1934
( 5,724)
548,354
( 5,724)
1935
19,167
704,260
19,167
1936
8,469
615,703
8,469
1937
4,160
603,643
4,160
1938
12,675
433,697
12,675
1939
85,857
$ 588
727,064
86,445
1940
2,846
(450)
465,045
2,396
1941
9,053
2,166
1,547,438
11,219
1942
(19,671)
2,351
2,076,211
(17,320)
1943
67,950
1,190
1,762,491
69,140
1944
73,976
9,080
2,188,547
83,056
1945
(20,993)
6,177
2,309,331
(14,816)
1946
20,821
15,925
2,152,827
36,746
1947
(21,416)
(26,820)
1,825,036
(29,633)
As a result of Olympic's operations during the first four months of 1948, it sustained a loss of $13,943.98. Olympic paid dividends per share as follows: 1930, $50; 1931, $40; 1934, $8.89; 1936, $5; 1939, *281 $45.50. No other dividends were declared or paid. Omaha has never paid any dividends. The 1,273 shares of Olympic stock which decedent owned in his own name were valued in his estate tax return as of April 22, 1948, the optional date, at $50 per share, and in petitioner's amended petition at $40 per share. In his determination of deficiency, the respondent increased the value thereof to $150 a share. This 1,273 shares of Olympic stock had a value on April 22, 1948, for estate tax purposes of $50 a share. Residence Property Decedent's residence is near the center of the 8 acre tract, some 400 feet from the main road, and due to its location and that of the road, subdivision of the land would tend to destroy the setting and existing value of the house. The residence is a large two and a half story Spanish style stucco frame construction with clay tile roof, has reception hall, four bedrooms, four baths, etc., and near the house is a three car garage. The house was built in 1924. Its roof leaks, there is a serious crack in the ceiling of the first floor, and other defects in the house and its fixtures exist which would likely require an expenditure of some $15,000 to modernize *282 and make the property salable. For three years the property has been listed for sale with an active real estate broker, with instructions to the broker to submit the best offers procurable, but so far no prospective buyer has developed. In decedent's estate tax return this real property and improvements was valued, as of April 22, 1948, at $62,905, but in petitioner's amended petition the value was reduced to $50,000. In his determination of deficiency the respondent determined the value of the property to be $70,000. This property had a value, as of April 22, 1948, for estate tax purposes, of $60,000. Trust Indentures On December 23, 1939, decedent created eight trusts for the benefit of his wife and seven children, naming himself in each as sole trustee, and transferred to each trust, as its original corpus, stock in Olympic. The names of the trusts and the number of shares of Olympic transferred to each were: Maude Eileen McDermott (wife), 150; John Lawrence McDermott, 150; James J. McDermott, 125; Claude D. McDermott, 75; Thomas L. McDermott, 75; Blanche Ceceilia McDermott, 75; Maude Mary Cusack, 100, and Eleanor Frances Reeds, 50. [Total 800 shares.] Olympic at once *283 issued separate stock certificates to the trustee for the number of shares owned by each trust. Separate books of account were kept by and for each trust, also separate bank accounts. All transfers of the stock were reported by decedent for Federal gift tax purposes at a value of $110 per share. The terms of the eight trusts are the same, with a few exceptions. A summary of pertinent provisions contained in all eight trusts are: "The 'trust estate' consists of property transferred in the trust instrument, plus any property subsequently transferred to the trustee. "Administrative duties, powers and discretion of the trustee generally are similar to those usually in such instruments. "The trusts declare they are 'irrevocable' and the trustee is 'without power at any time to revoke, change or modify the terms hereof.' "Item 'Seventh', paragraph '(g)' reads: "If at any time the trustee is required to divide the principal of the trust estate into parts or shares, or to distribute the same, he is fully authorized, in his sole discretion, to make division or distribution in kind, or partly in kind and partly in money, and he may assign undivided interests in any assets of the *284 trust estate to the several parts or shares, may make common investments of funds belonging to the several parts or shares, so long as it may be done advantageously, may hold the several parts or shares as a common fund, dividing the net income among the several parts or shares proportionately. The judgment of the trustee concerning the values for the purpose of such division or distribution of the property or securities in the trust estate shall be binding and conclusive on all parties interested therein. "Item 'Eighth', paragraph '(b)' [1] reads: "The net income of the trust estate shall be accumulated or distributed in the sole discretion of the trustee. If the trustee elects to accumulate net income, such income shall, at the end of the fiscal year or other accounting period fixed by the trustee during which the same is accumulated, be added to and become a part of the corpus of the trust estate. If the trustee elects to distribute net income during any fiscal year or other accounting period fixed by the trustee, such distribution shall be made to the beneficiary hereinafter named, at such time and in such amounts as the trustee shall determine. The trustee may accumulate part *285 and distribute part of the net income of the trust estate during any fiscal year or other accounting period fixed by the trustee." In all except the Maude Eileen Trust, it is provided that: "* * * if because of 'accident, sickness or other emergency or unusual condition of any kind presently unforeseen', the beneficiary should be in need of funds in addition to the income being received from the trust or other sources, the trustee is authorized to distribute such amount from the corpus as in his opinion is reasonably necessary or desirable to relieve such need. "Except in the Trusts for Thomas and Claude, each provided that the trust was to terminate approximately ten years after the date of creation; and that at such time, the corpus was to be paid to the beneficiary, if living. In the Trusts for Thomas and Claude, the trust estate was to be distributed to the beneficiary if living, in two installments: one-half at the end of such approximate ten-year period, and the other one-half five years *286 later." In all 8 trusts item "Seventh" paragraph "(f)" reads: "The trustee shall have power to determine whether any part of the trust estate or any addition or increment thereto be income or principal, or whether any cost, charge, expense, tax or assessment shall be charged against income or principal, or partly against income and partly against principal. If securities are purchased at a premium, the trustee shall have power to charge the premium either against income or principal, or partly against income and partly against principal, as may be deemed best by the trustee in his discretion. * * * all * * * decisions by the trustee under this paragraph shall be conclusive for all purposes and upon all persons." Provision of disposition to cover contingencies created by death of the beneficiary prior to termination of the trusts was made in each trust. In none of the trusts was there given or reserved to decedent any interest in the principal or income therefrom. On April 22, 1948, none of the eight trusts had terminated and all beneficiaries were then living. After the creation of the trusts on December 27, 1939, Olympic paid a dividend of $33 per share and each trust received *287 payment thereof on shares owned by it. In addition to the stock transferred in the trust instruments, each trust beneficiary except Maude Cusack then owned other Olympic stock in their own names, and they each contributed to the corpus of their respective trusts the Olympic dividend paid them at this time, amounting to $850 each in the John and James trusts and $825 in each of the other trusts except that of Maude Cusack. On April 7, 1942, United States Savings Bonds were purchased on behalf of each trust and in the name of each trust by using the funds then on deposit in the bank for each trust. The parties have stipulated that these bonds and the value thereof on the valuation date are correctly enumerated by the respondent in his deficiency notice under the heading "Assets" of each of the eight trusts. Since the purchase of these bonds all of the trusts have been inactive. No bonds or stocks have been bought or sold. None of the powers or discretions in the trusts has been exercised. No dividends have been received, no borrowing done and no corpus has been applied to relieve the needs of any beneficiary. The life expectancies of all trust beneficiaries, at the time when the *288 trusts were created, exceeded the periods for which the trusts were established. Separate income tax returns were filed by the trusts in reporting the Olympic dividends received in 1939. The Bureau first held, under the Clifford doctrine, that this income was taxable to decedent, but later held such income was "taxable to the trusts". The Olympic stock transferred in the eight trusts had a value, on April 22, 1948, of $50 per share. Petitioner in the estate tax return did not include these trusts in the gross value of the estate. Respondent, in his notice of deficiency concerning these trusts, states: "It is held that the Declaration of Trust, executed by decedent on December 23, 1939, known as the Maude Eileen McDermott Trust, in which the decedent, as Trustee, reserved the right to accumulate or distribute income within his sole discretion, is includible in the gross estate under Section 811 (c) of the Internal Revenue Code. "It is further held that the seven other Declarations of Trust executed by the decedent on December 23, 1939, known as the Thomas L. McDermott Trust, the Eleanor Frances Reeds Trust, the Maude Mary Cusack Trust, the Blanche *289 Ceceilia McDermott Trust, the Claude D. McDermott Trust, The John Lawrence McDermott Trust, and the James J. McDermott Trust, respectively, in each of which the decedent, as Trustee, retained the right to accumulate or distribute income within his sole discretion, and the further right to apply such amounts of corpus as he alone sees fit to the relief of the needs of each of the respective beneficiaries arising because of 'accident, sickness, or other emergency or unusual condition of any kind presently unforeseen,' are properly includible in the gross estate under Sections 811 (c) and 811 (d). "The right of the settlor, as Trustee, to accumulate or distribute income from each of such trusts is held to be a right to shift enjoyment of income within the meaning of Section 811 (c) of the Internal Revenue Code. The right of settlor, as trustee, of each of the abovementioned trusts, except that trust known as the Maude Eileen McDermott Trust, to invade corpus for the relief of the needs of the respective beneficiaries in case of accident, sickness, or other emergency, or unusual condition of any kind presently unforeseen, is held to be a right to alter, amend, *290 or revoke within the meaning of Section 811 (d) of the Internal Revenue Code." Opinion Petitioner in its estate tax return reports the value of the 1,273 shares of Olympic stock, on the optional valuation date of April 22, 1948, at $50 a share, while in its amended petition it alleges the value of such stock at such time to be "not more than $40 per share," and on brief petitioner contends on "basis of the evidence" the value was $41.50 per share. Respondent, in his notice of deficiency, places the value of these shares of Olympic stock on April 22, 1948, as $150 a share, and alleges the same value in his amended answer, and also on brief respondent contends for the same valuation, although his only witness on this issue testified the value was $110 per share. It is always difficult to determine the value of stock in a closely held corporation such as this, where its shares are not listed on any exchange nor dealt in over the counter, and for which there is no market, and no shares of which have ever been sold. Necessarily under such circumstances we must invade the realm of speculation in ascertaining value, and in so doing the opinion of experts may be *291 helpful. Petitioner produced two such experts, both of whom were qualified by education, training and practical experience in weighing and passing upon the value of stocks, one of whom testified the value of the Olympic stock on April 22, 1948, was $41.50 per share, while the other placed such value at $43 per share. Both testified at length and in detail as to the various methods of analysis used by them in reaching these figures. Both, and especially the one giving the lower valuation, had made a thorough and complete examination and study of the corporation, its financial condition, past, present and future, book value, earning capacity, dividends paid, its physical properties, etc. We were impressed with the exceptional qualifications of this witness as a valuation expert, and also his approach and comprehensive study of the matter. Respondent's expert, while qualified, did not appear to have given the subject as much thought and investigation and to have considered as many relevant factors tending to affect the value of the stock as had one of petitioner's experts, and hence we are inclined to attach more weight to petitioner's expert testimony. Respondent offered no evidence *292 in support of his $150 valuation, and under the evidence we think his expert's figure of $110 is excessive. There can be no mathematical accuracy in determining the value of a stock such as we have here. After all, the conclusion reached is theoretical and a matter of opinion about which even experts may differ, and while the expert's analysis, reasons and discussion are helpful in determining value, we are not bound to accept his conclusions as final or determinative of the issue, but the responsibility is ours to determine from all the evidence, expert and otherwise. Section 86.19 of Regulations 108, containing valuation criteria many times approved by this and other courts, provides: "(a) * * * The value of the property is the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell. * * *
"(b) If actual sales or bona fide bid and asked prices are not available, then * * * in the case of shares of stock, upon the basis of the company's net worth, earning power, dividend-paying capacity, and all other relevant factors having a bearing upon the value of the stock. * * *" The above *293 definition is the yardstick by which we have determined the value of the stock. Also in our findings of fact we have incorporated the data specifically mentioned in the regulations, together with all other relevant factors having a bearing upon the value of the stock. We deem it unnecessary to repeat here our findings. The value we are to find here is not the liquidating value of the stock, but the selling price which a willing buyer would likely pay therefor. There was no contemplated liquidation here, the stock in question was that of a going concern. We had a similar valuation question in Mathilde B. Hooper, 41 B.T.A. 114, where the stock in question had a book value of $145 a share, and we determined its fair market selling value to be $45 a share. We shall not discuss or recite the many unfavorable factors that would have discouraged an investor from buying the stock in question unless it could have been secured at a price far below its book value. We mention only four: (1) Olympic had made no money since the war years and had been in constant financial difficulties, and several times the Milwaukee Road had had to bail Olympic out by changing its contract and advancing *294 funds so that it could remain in business; (2) the financial condition of Olympic at about the time in question was such that a bank in Chicago refused to accept the stock in question as collateral security for a loan of either $40,000 or $15,000; (3) Olympic's principal source of income was from business dependent upon its contract with the Milwaukee Road, and that contract was subject to cancellation by the railroad at any time, which would thereby destroy Olympic's main source of business; (4) the value of the stock had been adversely affected by decedent's death, Olympic was a one man company, decedent was its founder and manager. We have examined and weighed all of the evidence bearing on the value of the stock in question. Based upon our consideration of that evidence, and a weighing of the factors established by it, we have reached the conclusion and have found as an ultimate fact that the value of the 1,273 shares of Olympic stock on April 22, 1948, was $50 a share. We have also found as an ultimate fact that the 800 shares of Olympic stock transferred to the eight trusts was, on April 22, 1948, of the value of $50 a share. The other valuation question relates to the land *295 and improvements in Bannockburn, which was decedent's residence. We deem it unnecessary to repeat here the facts concerning same which are contained in our findings of fact. We have carefully weighed and considered all of the evidence bearing on the value of this property, including that offered by both parties and their respective experts, and based thereon we have found as an ultimate fact the value of the so-called residence property, on April 22, 1948, to have been $60,000. The second issue relates to the trusts created by the decedent in 1939. Respondent contends that the corpora of the trusts are includible in the gross estate of the decedent under section 811 (c) (1) (B) or 811 (d) (1) of the Code. [2]
*296 With reference to section 811 (c), it is contended by petitioner that the decedent, at no time after the creation of the trusts, had any right, power or opportunity to "shift" beneficiaries, or to "designate" beneficiaries. Further, decedent's power to withhold income was like the power of the trustee in a trust which contains spendthrift provisions. As to section 811 (d), petitioner contends that the next to the last paragraph in the trust agreement, under which all trusts were expressly declared to be irrevocable, precludes the application of the section. In general trusts are includible in a decedent's gross estate if the decedent retained the right to govern the enjoyment of the trusts, section 811 (c), or if he retains the power to change enjoyment, section 811 (d). In ascertaining the includibility of a trust in a decedent's gross estate the courts look for a standard which will govern the decedent's power. In Cyrus C. Yawkey, 12 T.C. 1164, the only limitation on the use of the trustees' discretion was that they decided on what was to be for the "best interest" of the beneficiary. We held that this standard was not a sufficient limitation of the decedent's *297 power, and the trust was includible in the gross estate. Again, in Milton J. Budlong, 7 T.C. 756, 763; modified sub. nom. Industrial Trust Co. v. Commissioner, 165 Fed. (2d) 142, where the trustee could distribute the income at his discretion, we held "That was a right to shift economic benefits and enjoyment from one person to another, which is, we think, contemplated by the phrase 'to designate the persons who shall possess or enjoy * * * the income' from the property. * * * the express provisions of section 811 (c) are met." Under the present trust agreements decedent had the power to determine whether any part of the trust estate or any addition or increment thereto would be income or principal. In addition, the net income could be "accumulated or distributed in the sole discretion of the trustee." The trustee and the decedent were one and the same. The question arises whether the "sole discretion of the trustee" is a sufficient external standard which will prevent the application of section 811 (c). Quite to the contrary the words impose no objective standard, no standard which could be enforced by an equity court. The distribution or accumulation *298 of income is subject to the whim, the personal bias, or the temperament of the decedent. We do not think that his power is sufficiently restricted to preclude the application of section 811 (c). We also think that the same result would obtain if we were to analyze the trust agreements in the light of section 811 (d). In this instance we must determine whether the enjoyment of the interest transferred to the trust was subject to any change by the exercise of the decedent's power. In Commissioner v. Holmes' Estate, 326 U.S. 480, the Supreme Court emphasized that the "enjoyment" as used in section 811 (d) was not a term of art, but connoted substantial present economic benefit rather than technical vesting of title or estates. Under the present facts decedent had the power to distribute or withhold the income from the principal beneficiaries, or their survivors. Through this power, decedent could control the flow of the present economic benefit to the beneficiaries. He not only exercised control over the amount of benefit, but the time of benefit; and if the death of a principal beneficiary should intervene, he in part controlled who would benefit. Commissioner v. Holmes' Estate, supra. *299 With power to control enjoyment available to decedent by virtue of the trust agreements, we can only conclude that the decedent was able to change the enjoyment of the trust interests within the meaning of section 811 (d). Trust accumulations representing income on the property transferred by decedent are not includible in the gross estate. The statute, section 811 (c) or (d), is only concerned with transfer, and since trust income was not transferred to the trust by decedent such accumulations as represented by income are not includible in decedent's gross estate. Commissioner v. Gidwitz, 196 Fed. (2d) 813; affirming 14 T.C. 1263. Respondent concedes that the portion of the corpus of each trust which represents additions made by the beneficiaries is not to be included in the gross estate. That portion of each trust which is not to be included shall be determined under Rule 50. Decision will be entered under Rule 50. Footnotes
1. This paragraph is in the Thomas McDermott trust, but as to that trust it directs that the net income for the first year "shall be accumulated and added to the corpus of the trust."↩
2. SEC. 811. GROSS ESTATE. The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside of the United States - * * *
(c) Transfers in Contemplation of, or Taking Effect at, Death. - (1) General Rule. - To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise - * * *
(B) under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death * * * (ii) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom; * * *
(d) Revocable Transfers. - (1) Transfers after June 22, 1936. - To the extent of any interest therein of which the decedent has at any time made a transfer * * * by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power * * * by the decedent alone or by the decedent in conjunction with any other person * * *, to alter, amend, revoke, or terminate, or where any such power is relinquished in contemplation of decedent's death.↩