**F. W. DRYBROUGH, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**CITIZENS FIDELITY BANK & TRUST COMPANY, Executor of the Will of Marion S. Drybrough, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. Nos. 4105, 4106.**

United States District Court
W. D. Kentucky,
at Louisville.
July 24, 1962.

280

Rucker Todd, Louisville, Ky., for plaintiffs.

Wm. E. Scent, U. S. Atty., for defendant.

SHELBOURNE, District Judge.

The plaintiffs bring these actions to recover alleged overpayment of gift taxes for the years of 1956, 1957, and 1958. In action No. 4106, Citizens Fidelity Bank & Trust Company was substituted as plaintiff for Mrs. Marion S. Drybrough, the wife of F. W. Drybrough, who died while these actions were pending.

F. W. Drybrough filed a timely gift tax return for the year 1956, showing cash gifts of $6,000.00 each to his wife and son, F. W. Drybrough, Jr. The son's gift was divided between the parents and the $3,000.00 marital deduction allowed on the gift to Mrs. Drybrough, which placed the entire $12,000.00 in the maximum non-taxable category—$3,000.00 per person per year. Upon audit of this return, the Commissioner determined that an additional cash transfer from the Drybroughs to their son also should have been reported as a gift. Accordingly, this amount was split between the donors and a deficiency of $941.55 in gift taxes was assessed against each of them. The deficiency for Mrs. Drybrough was increased by the 25 percent penalty imposed by Section 6651(a) of the Internal Revenue Code of 1954 for failure to file a gift tax return.

A similar situation occurred relative to the year 1958. F. W. Drybrough reported the maximum non-taxable gifts to his son for that year, $6,000.00 divided between the spouses. The Commissioner determined that additional cash transfers from the Drybroughs to their son should have been reported as gifts. The total amount was split between the parents and a $660.00 deficiency assessed against each of them, with a 25 percent penalty assessed against Mrs. Drybrough for failure to file a gift tax return.

The principal issue involved in these suits is the evaluation of certain gifts made by the Drybroughs to their son on May 15, and June 13, 1957. Drybrough filed a timely gift tax return for the year 1957, showing gifts totaling $146,200.00. A gift of $6,000.00 to his wife was reported and the remaining amount constituted gifts to their son. The gifts to the son totaled $140,200.00, of which $70,100.00 was attributed to Mrs. Dry-

brough who filed a timely gift tax return thereon.

The gift to the son made May 15, 1957, was an undivided 40 percent interest in real estate located at 620 South Fifth Street in Louisville, Kentucky. The Drybroughs placed a value of $24,400.00 on the gift; the Commissioner valued it at $64,400.00.

The gift made June 13, 1957, was 40 percent of the issued and outstanding capital stock of four corporations. For several years, Mr. Drybrough has owned and operated a number of parking lots in downtown Louisville known as "Vic's Parking Lots." The sole assets of the four corporations were six parcels of real estate, four parking lots and two smaller pieces of property. On their returns, the Drybroughs valued the stock in the corporations given to their son at a total of $115,800.00; the Commissioner valued it at $462,400.00.

For the year 1957, Drybrough reported and paid gift tax of $15,097.49 and Mrs. Drybrough paid $15,097.50. The valuations of the Commissioner resulted in deficiency assessments of $47,483.47 against Drybrough and $46,909.00 against Mrs. Drybrough, which deficiencies also included an assessment for unreported cash transfers of $9,177.55 to their son during 1957.

As a result of the deficiency assessments for each of the three years here involved, the plaintiffs have paid the following additional amounts:

## MR. DRYBROUGH

| Year | Date Paid | Tax | Interest | Penalty | Total |
|---|---|---|---|---|---|
| 1956 | 5/18/60 | $ 941.55 | $ 172.73 | $ – | $ 1,114.28 |
| 1957 | 5/20/60 | 47,483.47 | 5,916.54 | – | 53,400.01 |
| 1958 | 5/18/60 | 660.00 | 41.88 | – | 701.88 |
| | | | | | $55,216.17 |

## MRS. DRYBROUGH

| Year | Date Paid | Tax | Interest | Penalty | Total |
|---|---|---|---|---|---|
| 1956 | 6/10/60 | $ 941.55 | $ 174.95 | $235.39 | $ 1,351.89 |
| 1957 | 5/23/60 | 46,909.00 | 5,844.96 | – | 52,753.96 |
| 1958 | 6/10/60 | 660.00 | 43.44 | 165.00 | 868.44 |
| | | | | | $54,974.29 |

Both of the taxpayers filed timely claims for refunds for each of the years in question. They each received notice of the disallowance of each and every claim for refund by certified mail on January 17, 1961, and these suits were filed on January 26, 1961.

The tax liability on the unreported cash transfers to F. W. Drybrough, Jr., in 1956, 1957, and 1958 arises from his father's practice of reimbursing him for all of his expenses as were shown in his checkbook during these years. At the trial of these cases, plaintiffs introduced certain of these checks written by Drybrough, Jr., in 1956 and 1957 which represented expenditures by him for and on behalf of his father and as his father's agent. No checks were introduced for the year 1958 and plaintiffs concede the correctness of the Commissioner's determination of the amount of taxable gifts for that year.

■■■ The checks of Drybrough, Jr., introduced in evidence, for which he was reimbursed by his father, totaled $1,113.15 in 1956 and $265.35 in 1957. Of these amounts, $36.00 in 1956 and $161.-

35 in 1957 were for birthday and Christmas presents given by him to his father. Drybrough's reimbursement to his son for the amounts spent for such presents, we hold to be taxable gifts; the remainder, we hold to be reimbursement for expenditures by the son as his father's agent and not taxable. Therefore, the taxable cash gifts from the Drybrough's to their son should be reduced by $1,077.-15 for 1956 and $104.00 for 1957, and the deficiency assessments for each of those years should be reduced accordingly. The deficiency assessments for 1958 are to stand as correct determinations of the plaintiffs' tax liability.

█ Next to be considered is the correctness of the 25 percent penalty imposed upon Mrs. Drybrough for failure to file gift tax returns for the years 1956 and 1958. Section 6651 of Title 26, United States Code, imposes on the Commissioner the duty to assess this penalty "unless it is shown that such failure [to file] is due to reasonable cause and not due to willful neglect." The taxpayer has the burden of showing reasonable cause for failure to file a return. 26 U.S.C.A. § 6651.

The proof shows that Mrs. Drybrough relied upon her husband to furnish their accountant the necessary information for the preparation of their gift tax returns. Drybrough did not report the cash transfers to their son made in 1956 and 1958 to the accountant, therefore, no returns were prepared for Mrs. Drybrough for those years. However, the proof also shows that she was aware that the cash transfers were made.

Plaintiffs contend that the proof that Mrs. Drybrough relied upon her husband to furnish the necessary information to their accountant sustains the burden of showing reasonable cause for failure to file gift tax returns in 1956 and 1958. Thelma A. Ramos, 14 CCH Tax Ct.Mem. 162 (1955), is cited in support of this contention.

In the Ramos case, the wife relied upon her former husband to file a joint income tax return. The return was signed only by the husband, but a portion of his former wife's income was reported thereon. The Tax Court questioned whether the return was a joint or individual return under those circumstances. Although the court held it to be an individual return, it found the existence of reasonable cause, by reason of Mrs. Ramos' reliance upon her former husband to file a joint return and her belief that it was a joint return, and held that her failure to file was not due to willful neglect. The case is distinguishable from the case at bar in that here there is no question that Mrs. Drybrough knew that no gift tax returns were filed by her in 1956 and 1958.

Section 301.6651–(3), Title 26, Code of Federal Regulations, provides:

"If the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time, then the delay is due to a reasonable cause."

The question of reasonable cause being supported by showing a wife's reliance upon her husband is discussed in Leo Sanders (1954), 21 T.C. 1012, 1020:

"Taxpayers who are required to file returns must take full responsibility for any delinquency in filing those returns. A wife required to file a return because of income of her husband in a community property state or who joins in a joint return cannot shed the responsibility for delinquency by saying that she relied entirely upon her husband, not a specially qualified tax authority; otherwise Congress would be frustrated in the purpose behind section 291(a) [the predecessor of section 6651]."

The Tax Court's decision was affirmed in Sanders v. Commissioner, (10 Cir., 1955) 225 F.2d 629, cert. denied 350 U.S. 967, 76 S.Ct. 435, 100 L.Ed. 839.

█ In each of the years in question, Mrs. Drybrough was required to file a gift tax return by virtue of the gifts to their son being divided between herself and her husband. It is concluded that

her penalty for failure to file in 1956 should be assessed on the basis of the Commissioner's determination of her taxable gifts for that year less one-half of $1,077.15, the amount held to be nontaxable reimbursements, and that the penalty assessed against her for 1958 should be upheld.

In 1957, the Drybroughs gave to their son a 40 per cent undivided interest in a parcel of real estate and 40 per cent of the issued and outstanding shares of the capital stock in each of four corporations which had realty as their sole assets. The taxpayers valued the real estate at $24,400 and the total capital stock at $115,800 in their gift tax returns. In their claims for refund they lowered their valuation of the stock in the four corporations to $109,928. In these suits plaintiffs seek to recover the amount of the deficiency assessments paid and refund of a portion of the tax reported and paid on their returns.

In order to arrive at the fair market value of the 40 per cent undivided interest in the real estate, the fair market value of that realty on the date of the gift should first be determined. The amount of the mortgage indebtedness, if any, on that date should be deducted from that figure to determine the fair market value of the equity in the whole of the property, then 40 per cent of that equity computed.

The evaluation of 40 per cent of the capital stock of each of the corporations involves the same problem—the value of the realty comprising the sole assets of each corporation. The parties agree that these figures first must be determined; that the mortgage indebtedness, if any, should be deducted from the value of the realty held by each corporation, and that 40 per cent of the resulting figure is the book value of 40 per cent of the issued and outstanding capital stock of the individual corporation.

Proper evaluation of real estate requires highly expert judgment. Plaintiffs retained the services of Kenneth Browne, vice president in charge of real estate for Citizens Fidelity Bank and Trust Company at Louisville and employed in its real estate department for some thirty years, and Harold Rosen, who has been engaged in real estate business for more than twenty years, to appraise the property here involved. Paul Kendall, active in the field of real estate since 1925, and E. D. Ballard, an employee in the Property Tax Division of the Kentucky Department of Revenue residing in Lexington, Kentucky, made defendant's appraisals. The testimony of Browne, Rosen, and Kendall shows each of them to be fully qualified experts in the appraisal of downtown Louisville real estate; Ballard lived in Louisville for three or four months in 1941 and again for approximately five months in 1942.

The 40 per cent undivided interest in property located at 620 South Fifth Street was given by the Drybroughs to their son on May 15, 1957. The testimony of the expert witnesses as to its fair market value on that date was as follows: Browne, $240,000; Rosen, $237,500; Kendall, $238,853, and Ballard, $270,000. After considering all of the testimony in this connection, it is concluded that the fair market value of the real estate on May 15, 1957, was $238,800; after deducting a mortgage indebtedness of $149,000, we find the equity in the whole of the property to be $89,800. Thus, the value of the equity in the 40 per cent undivided interest given to Drybrough, Jr., on that date was $35,920.

The Drybroughs made the gifts of stock to their son on June 13, 1957. The four corporations and the real estate evaluations involved are:

1. 655 South Fifth Street, Inc., had as its sole assets one piece of property, a parking lot located at 645–655 South Fifth Street known as "Vic's #1." Browne valued this property at $415,000, Rosen at $379,500, Kendall at $517,500, and Ballard at $555,500. There is an obvious disparity between the values arrived at by the witnesses for the respective parties. Part of this may be attributed to the defendant's witnesses

considering the sale of a piece of property situated fairly close to "Vic's #1" to Louisville Motors in 1955 as a comparable sale. Plaintiffs' experts denied that it was a comparable sale. Browne explained in some detail the circumstances under which that sale occurred which would result in its not being a true comparable. Further explanation of the disparity is found to be Kendall's capitalization of rental income from the lot on the basis of 1956 gross receipts; the gross receipts in 1957, up to the time of the gift, were in a decline from those of 1956.

Considering all of the testimony concerning this property, it is concluded that its fair market value was $430,000 on June 13, 1957. By deducting the mortgage indebtedness of $250,000 on this property on that date, we find that the fair market value of the equity was $180,000. We further find that the net asset value of 40 per cent of the issued and outstanding capital stock of 655 South Fifth Street, Inc., was $72,000 on June 13, 1957.

2. 800 South Fourth Street, Inc., had as its sole assets two pieces of property:

(a) A parking lot, "Vic's #3", located at 800–810 South Fourth Street. The fair market value of this property as of June 13, 1957, was fixed at $162,000 by both Browne and Rosen; Kendall valued it at $216,000 and Ballard at $190,270. Kendall's testimony reveals that he considered two purchases of property made by Standard Auto Company as comparable sales. Browne testified that he did not consider these sales to be true comparables since, to his knowledge, it was necessary for Standard Auto to acquire the property for expansion of its facilities; therefore, it possibly had to pay in excess of the true market value at that time. It is concluded that this property had a fair market value of $170,000 on June 13, 1957.

(b) The other parcel of real estate owned by this corporation is the real estate referred to in the record as the "southwest corner, Chestnut and Armory Place." Browne stated its fair market value to be $42,500; Rosen, $33,500; Kendall, $65,000, and Ballard, $84,000. The sale to Louisville Motors in 1955, used as a comparable sale in appraising "Vic's #1" owned by 655 South Fifth Street, Inc., was also used by Kendall in his appraisal here. There is doubt that this sale was a true comparable. After reviewing all the evidence, it is held that this property had a fair market value of $46,000 on June 13, 1957.

800 South Fourth Street, Inc., had assumed and agreed to pay a mortgage indebtedness of $100,000 on the first parcel of real estate; there was no mortgage against the second piece of property. By deducting the mortgage indebtedness from the total value of the real estate owned by the corporation, $216,000, we find $116,000 to be the fair market value of the equity in same. We also find that the net asset value of 40 per cent of the capital stock of this corporation was $46,400 on June 13, 1957.

3. 725 South Fourth Street, Inc., had as its sole assets one parking lot, "Vic's #5", located at 725–727 South Fourth Street. The fair market value of this property on June 13, 1957, was testified to be $240,000 by Browne, $228,800 by Rosen, $358,875 by Kendall, and $516,800 by Ballard. Based upon all of the evidence, it is concluded that this property had a fair market value of $275,000 on the date of the gift. The corporation had assumed and agreed to pay a mortgage indebtedness of $175,000 on this property, which places the value of the equity at $100,000. We find that 40 per cent of the capital stock of the corporation had a net asset value of $40,000 on June 13, 1957.

4. 720 South Fifth Street, Inc., owned a parking lot, "Vic's #4", located at 716–736 South Fifth Street and real estate at 717 South Fifth Street. Browne valued the parking lot at $210,000, Rosen at $194,600, and Kendall at $208,245. The other piece of property was valued at $11,000 by Browne, $9,900 by Rosen, and $13,600 by Kendall. Ballard made one appraisal on both pieces of property

in the amount of $220,000. Grouping the two parcels together, we have the following expert opinions of the combined market value of the real estate on June 13, 1957: Browne, $221,000; Rosen, $204,500; Kendall, $221,845, and Ballard, $220,000. It is concluded that the fair market value of the real estate on that date was $221,000. The corporation assumed and agreed to pay a mortgage indebtedness of $75,000 on the parking lot. After the amount of that indebtedness is deducted from the total value of the real estate, we find $146,000 to be the fair market value of the equity held in same by the corporation. It is concluded that the net asset value of 40 per cent of the capital stock of 720 South Fifth Street, Inc., was $58,400 on the date of the gift.

We list below a summary of the evaluations urged by the parties in their briefs and the values fixed herein by the Court:

|  | PLAINTIFFS Fair Market Value | DEFENDANT Fair Market Value | COURT'S FINDINGS Fair Market Value | 40% Interest* |
|---|---|---|---|---|
| 620 South Fifth Street | $238,750 | $238,853 | $238,800 | $35,920 |
| 655 South Fifth Street, Inc. | 397,250 | 517,500 | 430,000 | 72,000 |
| 800 South Fourth Street, Inc. | 162,000 | 216,000 | 170,000 | 46,400 |
| 725 South Fourth Street, Inc. | 234,400 | 358,875 | 275,000 | 40,000 |
| 720 South Fifth Street, Inc. | 212,750 | 221,845 | 221,000 | 58,400 |

* Based on fair market value of the equity in the whole of the property arrived at by deducting the amount of mortgage indebtedness from the fair market value.

---

In addition to the question of the fair market value of the real estate involved in the gifts of May 15 and June 13, 1957, the parties are in dispute as to what discount, if any, is applicable by virtue of the gifts being minority interests, be it in the ownership of real estate or shares of stock of a corporation. This question is twofold: first, whether a discount is applicable to an undivided interest in real estate and, second, whether a discount is to be applied to a minority interest in a closely held corporation.

In support of its contention that the gift of the 40 per cent undivided interest in the property at 620 South Fifth Street is not subject to a discount, the defendant cites Clifford A. Cook, (1925) 2 B.T.A. 126; National City Bank of New York, (1925) 2 B.T.A. 696; Emilie Baer, (1926) 3 B.T.A. 881; Adelaide McColgan, (1928) 10 B.T.A. 958. Each of these cases is distinguishable from the cases at bar in that there was either no testimony in the record upon which to base a discount or the testimony was that undivided interests in realty brought their proportionate share of the whole.

Plaintiffs rely on Tishman v. United States, D.C.Va., 1959, 207 F.Supp. 830, and the testimony of their expert witnesses to support their contention that a discount is applicable. Browne and

Rosen each testified that a discount of 25 per cent would be proper for the undivided interest in this property given to Drybrough, Jr. Defendant's witness Kendall did not testify on this point and Ballard said that a 10 per cent discount would be proper. In the Tishman case, a discount of 15 per cent was allowed on a one-half undivided interest.

In William R. Stewart, Jr., (1934) 31 B.T.A. 201, one-fifth and one-third fractional interests were involved. A witness for the taxpayer said that the one-fifth undivided interest should be discounted by 30 per cent and that the proper discount for the one-third undivided interest was 25 per cent. Another expert witness for the taxpayer testified that a 40 per cent discount would be proper. The Government's witnesses testified that no discount should be allowed. After pointing out that the Government's witness was not able "to support his testimony with a record of actual sales", the Board of Tax Appeals concluded that a discount of 15 per cent should be allowed on both fractional interests. The Tax Court has followed this decision in Sallie Houston Henry, (1944) 4 T.C. 423, 446, and in Nina M. Campanari, (1945) 5 T.C. 488, 493. It was also approved in Winkle v. United States, (D.C.Pa., 1958) 160 F.Supp. 348.

The fact that some of the cases cited deal with estate taxes rather than gift taxes is of no moment. In Heringer v. Commissioner, (9 Cir., 1956) 235 F.2d 149, at pages 152 and 153, it was said:

"It is well established that the provisions of the gift tax statute are to be construed as *in pari materia* with the provisions and purposes of the estate tax statute, see e. g. Sanford's Estate v. C. I. R., 1939, 308 U.S. 39, 60 S.Ct. 51, 84 L.Ed. 20."

■ From a consideration of all the testimony, we are of the opinion that the value of the fractional interest in the property located at 620 South Fifth given to Drybrough, Jr., by his parents, herein determined to be $35,920, should be discounted 15 per cent. We hold $30,-532 to be the fair market value of the

Drybrough's gift to their son on May 15, 1957.

■ All relevant factors affecting the value of the capital stock of the closed corporations involved here must be considered. Such factors include, but are not limited to, earning capacity, anticipated profits, book value, and dividend yield. Mathilde B. Hooper, (1940) 41 B.T.A. 114, 129. Inasmuch as these corporations were newly formed at the time in question they were without any history of profits or dividends. The parties appear to have agreed that the fair market value of the shares of stock given to Drybrough, Jr., should be determined through the establishment of their book value and determination of what discount, if any, is to be applied by virtue of such shares representing a minority interest in each of the four corporations.

To support its contention that no minority discount should be allowed in the present suits, the defendant cites H. Smith Richardson, 2 CCH Tax Ct. Mem. 1039 (1943). At page 1047 of its opinion, the Tax Court said:

"If the arguments of the petitioner were to prevail [relative to minority discounts], any cohesive family owning securities having a market value readily ascertainable from trading on the open public market could organize a family holding corporation, transfer to such corporation the securities which it owns, and then deal with the stock of the family corporation on the basis that it has by reason of petitioner's arguments a market value of only approximately half of the market value of the securities owned by such a corporation, thus cutting in two gift taxes and estate taxes which would otherwise be payable on the transfer of the securities themselves.

"We cannot agree. Closely-held stock of a family holding company which was never sold on the open market and was never intended by the organizers of the corporation to be sold, but was intended to be held by members of the family to evi-

dence their respective beneficial rights in securities which were bought and sold by the corporation and which were dealt in on the open market, can only be valued in any real or practical way *by primarily considering the value of the securities owned* by the corporation. Any other approach would, in our opinion, be futile."

The emphasis the Tax Court placed on the consideration to be given the value of the portfolio of this family investment corporation, however, does not mean the book value of that corporation is controlling. On the appeal of this case, Richardson v. Commissioner, (2 Cir., 1945) 151 F.2d 102, cert. denied 326 U.S. 796, 66 S.Ct. 490, 90 L.Ed. 485, Judge Hincks, then a District Judge sitting by designation, at page 105 of his opinion, pointed out:

"To me, at least, the findings and opinion when read together strongly suggest that the valuation adopted was based upon some such theory as was enunciated by the respondent's experts whereby the controlling criterion of value for stock such as this was taken to be not its fair market value as provided in the applicable regulations of the Treasury Department but rather some notion of 'intrinsic' value. *If so, the holding was erroneous.* (Citing cases.)

"Feeling that there is at least a substantial doubt as to whether the conclusion is based upon proper standards, I should favor a remand so that the Tax Court might have opportunity to correct the error if one was made or to remove the doubt which exists as to the standard which was actually applied. * * * My brothers, however, feel that the finding that the 'fair market value' was not less than $95.509 per share sufficiently attests the use of a proper standard and that this court should affirm the valuation as made." (Emphasis added.)

From this language in the appellate court's opinion, it is concluded that the Richardson case does not properly stand for the proposition urged by the defendant.

In the later case of Whittemore v. Fitzpatrick, (D.C.Conn., 1954) 127 F. Supp. 710, Judge Hincks, at that time a Circuit Judge sitting as District Judge, had an opportunity to consider the same problem. His comprehensive opinion allowed a 50 per cent minority discount on 600 shares of stock of a corporation having a total of 820 shares. The 600 shares fell 15 below the number required to control liquidation. The corporation was a family holding company and, as in the cases at bar, the gift of stock was made by the father to his sons.

Other cases holding that minority stock interests in closed corporations are usually worth much less than the proportionate share of the assets to which they attach are Andrew B. C. Dohrmann, (1930) 19 B.T.A. 507; Cravens v. Welch, (D.C.Cal., 1935) 10 F.Supp. 94; Estate of Irene DeGuebriant, (1950) 14 T.C. 611, reversed on other grounds Claflin v. Commissioner of Internal Revenue, 2 Cir., 186 F.2d 307; Mathilde B. Hooper, (1940) 41 B.T.A. 114, 129; Bartram v. Graham, (D.C.Conn., 1957) 157 F.Supp. 757; Bader v. United States, (D.C.Ill., 1959) 172 F.Supp. 833, and Snyder's Estate v. United States, (4 Cir., 1961) 285 F.2d 857.

The question in computing the fair market value of the stock gifts made by the Drybroughs to their son on June 13, 1957, is how much discount is applicable. The testimony of an expert witness on this question was offered by each of the parties—Bart A. Brown, vice president of the trust department of Citizens Fidelity Bank and Trust Company and employed in that department for some thirty years, by the plaintiffs and James P. Normile, an employee of the Internal Revenue Service and formerly a financial and investment security analyst, by the defendant.

After stating that the holder of minority interests in Kentucky corporations

cannot control policy, dividends, or liquidation of the corporations and, therefore, such interests are not readily marketable, Brown testified that he would consider sales of the minority interests in the four corporations given to Drybrough, Jr., "excellent" if the interests sold at a discount of from 33⅓ to 50 per cent.

Normile testified that his position with the Internal Revenue Service since 1950 was that of a "valuation expert," with particular reference to the valuation of securities, stocks, or municipally owned corporations. His opinion was that a fair and reasonable discount to the taxpayers on the minority interests in question would be approximately 20 per cent.

■ After considering all of the testimony, it is concluded that a discount of 35 per cent is the proper discount to be applied to the minority interests in the corporations involved here.

Applying the discount of 35 per cent to the previously determined fair market value of the real estate comprising the sole assets of the four corporations, the fair market value of the 40 per cent of capital stock of each corporation given to Drybrough, Jr., by his parents on June 13, 1957, is held to be as follows:

| | |
|---|---:|
| 655 South Fifth Street, Inc. | $ 46,800 |
| 800 South Fourth Street, Inc. | 30,160 |
| 725 South Fourth Street, Inc. | 26,000 |
| 720 South Fifth Street, Inc. | 37,960 |
| Total value of stock gifts | $140,920 |

Plaintiffs' counsel, upon notice to opposing counsel, will submit appropriate judgments in accordance with the views expressed herein.