ESTATE OF RICHARD O. YEAGER, DEEASED, JEAN M. MANNING, EXECUTRIX, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Yeager v. Commissioner
Docket No. 33375-83.
United States Tax Court
T.C. Memo 1986-448; 1986 Tax Ct. Memo LEXIS 157; 52 T.C.M. (CCH) 524; T.C.M. (RIA) 86448; September 17, 1986. E. M. Murray and Matthew W. Stanley, *158 for the petitioner. Robert F. Geraghty, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined a deficiency in petitioner's Federal estate tax in the amount of $115,601. After concessions, the issues for decision are the fair market value of common and Class B preferred stock in Cascade Olympic Corporation on the alternate valuation date of March 3, 1980, and whether certain corporate stock characterized by the Commissioner as community property was the separate property of the decedent's surviving spouse. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and accompanying exhibits are so found and incorporated herein by reference. Richard O. Yeager (the decedent) died testate on September 3, 1979. At all times pertinent to this case, the decedent resided in Shelton, Washington. The decedent was survived by his wife, Jean (now Mrs. Manning), whom he married on September 8, 1960. Mrs. Manning had two sons by a former marriage, Mack Davis Elliott and Scott Elliott, and a grandson, Jeffrey Elliott. Throughout their marriage, the decedent and Mrs. Manning were residents *159 of the State of Washington. Mrs. Manning resides in Olympia, Washington. The mailing address of the Estate of Richard O. Yeager, deceased, Jean M. Manning, Executrix (petitioner), was Shelton, Washington, at the time the petition in this case was filed. Mrs. Manning has been duly appointed and qualified as the personal representative of the decedent's estate. The estate is being administered in the Superior Court of Mason County, Washington. Petitioner filed a timely estate tax return with the Internal Revenue Service in Ogden, Utah, upon which it elected the alternate valuation date of March 3, 1980. The estate tax return reported an estate tax liability of $33,237, which petitioner elected to pay in installments pursuant to section 6166. [1]
On the date of his death, decedent owned, among other things, 100 shares of common stock and 50 shares of Class B preferred stock of Cascade Olympic Corporation (hereinafter referred to as Cascade *160 Olympic) as his separate property. The 100 shares of common stock of Cascade Olympic represented 50.25 percent of the voting power in the corporation. Cascade Olympic was the common parent of a group of affiliated corporations as defined by section 1504. The other corporations within this group were Capital Cascade, Inc. (Capital Cascade), Capitol Center, Inc. (Capitol Center), Center Offices, Inc. (Center Offices), and Capital Cascade Investment Corporation (Cascade Investment). Except for the parent corporation, Cascade Olympic, all of the affiliated corporations listed above had only common stock outstanding as of the alternate valuation date. The affiliated corporations were incorporated under the laws of the State of Washington on the following dates: Cascade Olympic, August 13, 1948; Capital Cascade, June 21, 1956; Capitol Center, June 25, 1962; Center Offices, March 21, 1966; Cascade Investment, December 18, 1978. [2]
Each of the affiliated *161 corporations was owned in part by at least one other member of the affiliated group, although all of the corporations also had minority shareholders who were not members of the affiliated group. The ownership of the common stock of each member of the affiliated group was as follows: Percentage
Par Value
Mumber of Shares
Corporation
Shareholder
of Ownership
Per Share
of Common Stock
Cascade Olympic
Decedent
50.25
$100.00
100    Others
49.75
99     199    Capital Cascade
Cascade Olympic
81.69
$ .40
196,374
Center Offices
12.48
30,000 Others
5.83 14,016 240,390
Capitol Center
Center Offices
86.01
$ .50
34,364 Others
13.99
5,565  39,929 Center Offices
Cascade Olympic
39.92
$ 10.00
1,996  Capital Cascade
42.40
2,120  Capitol Center
4.14 207    Others
13.54
677    5,000  Until his death, the decedent was president, chief executive officer, and a director of Cascade Olympic, Capital Cascade, and Capitol Center. He was the only officer and director of these corporations who was involved in their *162 day-to-day affairs. The decedent was also president of Center Offices until 1979. The presence of the decedent was critical to the operation of both Cascade Olympic and the affiliated corporations. On the alternate valuation date, March 3, 1980, the officers of Cascade Olympic and Capital Cascade, all of whom were also directors, were as follows: Jean Manning, President; William McCann, Vice-President; and Mack D. Elliott, Secretary-Treasurer. At that date, the officers of Capitol Center, all of whom were also directors, were as follows: Jean Manning, President; Glendon A. Ferguson, Vice-President; and Mack D. Elliott, Secretary-Treasurer. Harold Sargent and Roy McConkey were also directors. The officers of Center Offices, all of whom were also directors, were as follows: Mack D. Elliott, President; P. W. Harrington, Vice-President; and Patricia Kennedy, Secretary-Treasurer. Jean Manning was a director of Center Offices, but not an officer. On the alternate valuation date Cascade Olympic had three classes of stock, each of which had a $100 par value: common, Class A preferred, and Class B preferred. The owners of the common stock were entitled to vote. The holders of Class *163 A and Class B preferred stock had no voting rights, but were entitled to annual, noncumulative dividends up to a maximum of 5 percent of par value before the payment of any dividends to the holders of common stock. Upon dissolution, the holders of Class A preferred stock were entitled to a preference to the extent of par value and accumulated dividends, if any, while the holders of both Class B preferred and common stock were entitled to share equally in the remaining assets. As of March 3, 1980, the alternate valuation date, 1,980 shares of Cascade Olympic Class A preferred were outstanding, 200 of which were owned by Capital Cascade and 1,780 of which were owned by individuals other than the decedent or Mrs. Manning. As of that date, the Class A and Class B preferred stock of Cascade Olympic was held as follows: Preferred A
Preferred B
Shareholder
Number of Shares
Number of Shares
Decedent
50 Center Offices
120
Capital Cascade
200  232
Others
1,780
119
1,980
521
The principal assets of Capital Cascade included third-party receivables, real estate, and stock ownership in Center Offices. During the 1960's and until 1975 or 1976, *164 a division of Capital Cascade operated as a construction company, at times employing up to 500 people. On March 1, 1978, Capital Cascade sold the common stock of an unrelated corporation for $900,000 to CHG International, Inc. (CHG). The contract terms provided for a $50,000 down payment and payments of $6,000 each month thereafter with the balance payable in full on or before 10 years from the date of sale. With interest accruing on the unpaid principal balance at the rate of 8.5 percent per annum, required monthly payments of CHG were insufficient to cover accrued interest on the note.The note provided that the "Maker shall be entitled to a moratorium on monthly payments (not to exceed in the aggregate 36 monthly payments, which may be taken at any time and from time to time in any combination or combinations during the term of this note) * * *." On December 20, 1979, CHG invoked the moratorium provision as of January 1, 1980. Capital Cascade required CHG to pay 3 months of interest payments that were in arrears before permitting the moratorium. At the end of the 3-year moratorium period, CHG settled the obligation. On December 26, 1978, Capital Cascade and CHG entered into *165 a purported limited partnership agreement to form Talisman Associates. Capital Cascade lent CHG $360,000, secured by a promissory note, which CHG invested in a property known as Talisman Apartments. On that same date, Capital Cascade executed an option on another property on behalf of the partnership. Capital Cascade brought suit in Pierce County Superior Court against CHG to recover the amount due on the Talisman Apartment loan and the price paid for the option. The court concluded, inter alia, that the promissory note was enforceable according to its terms but that the purported partnership agreement and option were unenforceable. In February 1978, Capital Cascade acquired a note from Bel Corporation (Bel) of Anchorage, Alaska, an unrelated entity, which required Bel to pay the sum of $15,000. Bel defaulted on the note and in February 1979, Capital Cascade brought suit to collect the balance of the note plus interest. Bel answered the lawsuit in March 1979, denying liability on the note and asserting counterclaims. As of December 31, 1979, the unpaid balance of the note was $16,598. In 1980, Capital Cascade concluded that the note was uncollectible and claimed it as a bad *166 debt on its Federal tax return for the taxable year 1980. On August 10, 1976, Capital Cascade entered into a joint venture agreement with Structurals Northwest, Limited, to participate in the construction of the Comprehensive Health Facility, a hospital in Bethel, Alaska (the Bethel project or the project). The primary involvement of Capital Cascade was to provide financing. Cascade Olympic Construction Company d/b/a Structurals Northwest, Ltd. (the joint venture), contracted with the prime contractor to furnish and install siding, prefabricated panels, and decking. The joint venture subcontracted its materials and installation responsibilities to H.F. Industries and Adkins Steel Company, respectively. St. Paul Fire & Marine Insurance Company (St. Paul), on behalf of the joint venture, executed a performance bond in favor of the prime contractor. Indemnity agreements were executed in favor of St. Paul as surety by others, including, Cascade Olympic, Capital Cascade, and the decedent and Mrs. Manning. The Bethel project was scheduled for completion by August 1, 1978, and the contract provided for liquidated damages for any delay in completion in addition to exposure to liability *167 for deficiencies in the project. The Bethel project was not timely completed. Two major problems developed with the project which affected Capital Cascade. The first was a structural problem with the siding and delamination of panels that could have resulted in potential liability of up to $2 million, but which was eventually resolved by hiding the defect with signs. The second, more substantial problem was that the other joint venturer, Structurals Northwest, and its owner had no money for completing the project nor money for the indemnity agreements. After Capital Cascade advanced $174,000 to the joint venture through the surety, arrangements were made for St. Paul to advance the remainder of the funds needed to complete the project. During 1979, Capital Cascade paid or accrued expenditures for the Bethel project approximating $467,000, representing amounts paid by both Capital Cascade and by St. Paul. As of December 31, 1979, Capital Cascade expected to pay a minimum of $184,000 to complete the Bethel project. In the fall of 1979, the joint venture owed money to both of its subcontractors, H.F. Industries and Adkins Steel. By the end of 1979, Adkins Steel had stopped *168 work on the project and had joined H.F. Industries in a proceeding under the Miller Act, 40 U.S.C. sec. 270a et seq., to recover damages from the joint venture. In response to the claims under the Miller Act, the joint venture employed engineers to analyze the project's problems and the potential liabilities. The prime contractor also filed a claim with the U.S. Department of Health, Education and Welfare (HEW) for its unwarranted certification requirements that delayed the completion of the project. By March 3, 1980, Capital Cascade had incurred major losses on the Bethel project and the extent of further losses or potential recoveries was uncertain. The best estimate as of that date as to the losses anticipated on the project was: (1) $50,000 to $200,000 to repair the panels; (2) $500 per day liquidated damages for a period in excess of 19 months; (3) $300,000 maximum exposure in the suit brought by the prime contractor; (4) $66,000 maximum liability to the prime contractor for the cost of heating the building for the subcontractors through two extra winters; (5) uncertain exposure for the delamination problems in a range from zero to $2 million; (6) up *169 to $85,000 liability to Adkins Steel, a subcontractor to the joint venture; and (7) legal and engineering fees of approximately $130,000. Counterbalancing these claims, however, were likely possibilities of recovery for the joint venture's claims against HEW through the prime contractor's suit, the payment of the retainage on the project, and the likelihood of a reduction in the eventual liability for many of the risks listed. The Bethel project was finally completed on September 30, 1980, and accepted by HEW in February 1981. Capital Cascade recovered a total of $507,000 in the years 1982 and 1983 as a result of the recovery by the prime contractor for its claims against HEW which served to offset some of the losses incurred by Capital Cascade with respect to the hospital. Capital Cascade also recovered $97,000 in retainage from the prime contractor and approximately $50,000 for extras ordered during the construction process. Capital Cascade's final net loss on the Bethel project was approximately $650,000. The principal assets of Capitol Center included receivables, the Tacoma Mall Office Building (Tacoma Mall), and stock ownership in affiliated companies. Tacoma Mall was *170 acquired by Capitol Center in 1975. The fair market value of Tacoma Mall on the alternate valuation date was $5,200,000. The outstanding mortgage on Tacoma Mall was placed on the property in early 1968 and it required monthly payments of $17,400. The note, due in full in March 1993, carried an interest rate of seven percent, and included a substantial prepayment penalty. As of the alternate valuation date, the unpaid balance on the note was $1,845,086. The mortgagee was approached after September 1980, about the possibility of a waiver of the prepayment penalties or a discount for prepayment. Although the prevailing interest rate on comparable obligations entered into at or near the alternate valuation date was approximately 12.5 percent, the mortgagee declined to agree to more favorable repayment terms. All of the income of Capitol Center for the taxable year 1979 was derived from the rental of its principal asset, Tacoma Mall, to an affiliated corporation, Center Offices. [3] Center Offices leased Tacoma Mall from Capitol Center and managed and operated the property. Management problems became apparent, however, after the death of the decedent and Mrs. Manning assumed management *171 of the property from Center Offices from 1980 until April 1981. Thereafter Tacoma Mall was managed by an independent property management firm. Tacoma Mall was not available for purchase as of the alternate valuation date nor was any sale of the property anticipated at that time. The only justification for a sale of Tacoma Mall in March 1980, would have been to provide cash to advance to Capital Cascade. However, such an infusion of cash would have complicated the efforts of Capital Cascade to obtain the assistance of the bonding company. It also would not have been in the interest of the minority shareholders of Capitol Center. At that time, there was no business purpose for selling Tacoma Mall from the viewpoint of Capitol Center. After the preparation and the filing of the estate tax return, a potential buyer approached Capitol Center. Although no offer to purchase materalized, the possibility of a sale focused the attention of the board of directors on solutions to the problems that had developed with the management of Tacoma Mall since the death of the decedent. In the fall of 1980, the board of directors of Capitol *172 Center, which included representatives of the minority shareholders, decided that a sale might be advisable in light of the management problems. Although the property has never been listed for sale, the availability of Tacoma Mall was made known after September 1980 to all major real estate brokers in the area, real estate investment companies, and Merrill Lynch. A number of proposals were received and two were accepted in late 1980, one as primary and another as backup. The board of directors of Capitol Center made the concurrent decision to change management of Tacoma Mall should neither proposal result in a completed sale. Cascade Investment was organized by the decedent prior to his death. The only property transferred to Cascade Investment upon its incorporation was cash in the amount of $4,800. Cascade Investment was never activated. The intentions of the decedent with respect to the operations of this corporation were not known. At one time, a transfer of Cascade Olympic Class B preferred stock to Cascade Investment was anticipated and a stock certificate was prepared but never delivered to Cascade Investment. The certificate was cancelled in January or February of *173 1980, immediately after a meeting was held to dissolve Cascade Investment. Cascade Investment was reported as an affiliated corporation on Cascade Olympic's consolidated income tax returns for the calendar years 1979 through 1982. During the period relevant to this case, Cascade Investment earned no income. Cascade Investment was administratively dissolved by the State of Washington on December 30, 1983, for failure to comply with notice and licensing requirements. As of March 3, 1980, the book values of the assets of Cascade Olympic and its affiliated corporations, excluding the interests held by each corporation in an affiliated corporation, were as follows: Assets:
Book Value
Cash
$ 53,500
Accounts Receivable
16,767
Current Portion Notes, Loans,
Contracts Receivable
335,600
Marketable Securities
51,247
Federal Tax Receivable
4,632
TOTAL CURRENT ASSETS
$ 461,746
Land
$ 352,495
Buildings, Furniture and
Fixtures Net Depreciation
1,976,031
Long-term Notes, Loans,
Contracts Receivable
1,756,970
Other Investments
44,042
Other Receivables
31,986
Goodwill of Subsidiaries Purchased
584,770
Mortgage Reserve for Taxes and
Insurance
11,789
Utilities Deposit
160
TOTAL ASSETS
$5,219,989
Liabilities: Notes Payable
$ 227,870
Accounts Payable
307,465
Advance Rental Income
32,665
Accrued Interest
10,763
Current Portion Long-Term Debt
82,500
TOTAL CURRENT LIABILITIES
$ 661,263
Unearned Discount
$ 2,127
Long-Term Debt
1,762,586
Deferred Income
747,410
Minority Interests in Unconsolidated
Subsidiaries
766,339
Stockholder's Equity
Class A
$180,000
Class B
16,900
Common
19,900
Retained earnings
1,063,464
1,280,264
TOTAL LIABILITIES
$5,219,989
*174 On the date of decedent's death, Cascade Olympic, Capital Cascade, and others owned the outstanding stock of BHC, Inc. (BHC), but BHC was not a member of the Cascade Olympic affiliated group. BHC was incorporated on April 9, 1979, under the laws of the State of Washington, to own, develop, and market real property. The principal assets of BHC included receivables from Thousand Trails, Inc. (also known as Pacific Rim) and land. The initial officers of BHC, all of whom were also directors, were as follows: the decedent, President; Mack D. Elliott, Vice-President; and Mrs. Manning, Secretary-Treasurer. As of the alternate valuation date, BHC had two classes of stock, each of which had a $1.00 par value: common and Class A preferred. The owners of the common stock were entitled to vote. The holders of Class A preferred stock had no voting rights, but were entitled to annual, non-cumulative dividends up to a maximum of 5 percent of par value before the payment of any dividends to the holders of common stock. Upon dissolution, the holders of Class A preferred stock were entitled to a liquidating preference to the extent of par value. In April 1979, the following persons acquired BHC *175 stock by purchase or in exchange for real property: Stockholder
Common Shares
Class A Preferred Shares
Cascade Olympic
2,000
17,500
Capital Cascade
2,500 Decedent
30   Jean Manning
10   Mack Elliott
10   Others
2,000
20,000
4,050
40,000
In May 1979, BHC entered into a Subcription Agreement with Thousand Trails, Inc. (Thousand Trails), a travel- trailer/campground business, which provided for the acquisition by Thousand Trails of 2,000 shares of the common and 20,000 shares of the preferred stock of BHC. The purchase price was $510,000, to be paid by the assignment of certain installment contracts yielding a monthly return of $11,300 for 5 years. The BHC stock to be purchased under the Thousand Trails subscription agreement was to be held in escrow as a guarantee for the value of the Thousand Trails installment contracts. The parties to the subscription agreement further agreed that, upon completion of the stock purchase, they would execute a buy/sell agreement whereby either party could make a purchase offer for the entire interest of the other. The party receiving the offer could then buy the other parties' interest or *176 sell its own at the offered price. Alternatively, Thousand Trails could then tender all of its preferred and common shares for certain real estate described in the agreement. BHC was also required under the terms of the agreement to loan $250,000 to Thousand Trails for 12 months. Mrs. Manning had no stock interest in Cascade Olympic or any of its subsidiaries prior to her marriage to the decedent. In 1965, she acquired 10 shares of Cascade Olympic common stock. The shares were given to her by her husband as a gift. Her ownership of these shares continued through March 1980. In 1969, Mrs. Manning purchased 660 shares of Capital Cascade stock for $1,200 with the proceeds from the sale of her residence which was separately owned by her. Her ownership of the 660 shares of Capital Cascade continued through March 1980. Petitioner filed a timely estate tax return with the Internal Revenue Service in Ogden, Utah, using the alternate valuation date of March 3, 1980. The major assets of the estate were the 100 shares of common stock of Cascade Olympic valued by the estate at $357,500 and 50 shares of Preferred B stock of Cascade Olympic valued at $178,750. The estate tax return reported *177 an estate tax liability of $33,237. On August 31, 1983, the Commissioner mailed a statutory notice of deficiency to petitioner. As relevant to this opinion, the Commissioner determined that the value of all of the shares of Cascade Olympic was $7,166.60 per share resulting in a value of 100 shares of common stock of Cascade Olympic at $716,660 and 50 shares of Preferred Class B stock of Cascade Olympic at $358,330. The Commissioner also determined that 510 [4] shares of Capital Cascade and 10 shares of Cascade Olympic in the name of Mrs. Manning were community property and that half of the value of those shares or $44,248 should be included in the estate. The deficiency determined was $115,601. Petitioner disputes the deficiency and claims that its return overstated the value of the Cascade Olympic stock and that there is no estate tax due or payable by reason of the decedent's death. Petitioner, therefore, claims an overpayment of estate tax. ULTIMATE FINDINGS OF FACT The fair market value of *178 each share of common and Class B preferred stock in Cascade Olympic Corporation held by decedent as of the alternate valuation date of March 3, 1980, is $3,395 with a total fair market value of $509,250. The shares of Cascade Olympic and Capital Cascade held in the name of Mrs. Manning, the widow of decedent, were her separate property in which the decedent held no interest at the time of his death. OPINION The Commissioner's determination in his statutory notice of deficiency is presumptively correct, and petitioner has the burden of disproving each individual adjustment. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). The issues for decision in this case are the valuation of stock held by the decedent and the nature of the interest, if any, held by the decedent in shares of Capital Cascade and Cascade Olympic held in the name of Mrs. Manning. We shall discuss the valuation issue first. The valuation controversy is over the value of shares of Cascade Olympic. As demonstrated in our findings of fact, however, the valuation of these particular shares requires an examination of the entire group of interrelated corporations including members of the consolidated *179 group and BHC.To recapitulate, Cascade Olympic directly owned 81.69 percent of Capital Cascade, 39.92 percent of Center Offices, and 49.38 percent of the common stock of BHC. As Capital Cascade and Center Offices each owned interests in at least one of the other affiliated corporations or BHC (not a member of the affiliated group), however, the valuation of the Cascade Olympic stock held by decedent must consider the valuation of those interests as well. Relevant portions of section 20.2031-1(b), Estate Tax Regs., provide: The value of every item of property includible in a decedent's gross estate under sections 2031 through 2044 is its fair market value at the time of the decedent's death, except that if the executor elects the alternate valuation method under section 2032, it is the fair market value thereof at the date, and with the adjustments, prescribed in that section. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. The fair market value of a particular item of property includible in the *180 decedent's gross estate is not to be determined by a forced sale price. Nor is the fair market value of an item of property to be determined by the sale price of the item in a market other than that in which such item is most commonly sold to the public, taking into account the location of the item wherever appropriate. * * * The value is generally to be determined by ascertaining as a basis the fair market value as of the applicable valuation date of each unit of the property. * * * All relevant facts and elements of value as of the applicable valuation date shall be considered in every case. * * * Valuation issues are inherently imprecise and capable of resolution only by a Solomon-like pronouncement. Buffalo Tool & Die Mfg. Co. v. Commissioner,74 T.C. 441, 452 (1980); Messing v. Commissioner,48 T.C. 502, 512 (1967). We must, however, apply the facts and circumstances test of section 20.2031-1(b), Estate Tax Regs., and establish the fair market value of the stock held by decedent as the parties have failed to agree. The fair market value of closely held stock on any given date is a factual question and requires that we consider and weigh *181 all relevant evidence in the record. Mauldin v. Commissioner,60 T.C. 749, 759 (1973); Kaplan v. Commissioner,43 T.C. 663, 665 (1965). We have carefully considered all of the evidence contained in the entire record including the stipulations of fact, the testimony of all witnesses presented by the parties, and the numerous exhibits. We have analyzed all of the evidence and given due weight to each item with proper regard for the fact that the burden of proof is upon petitioner. Among the factors considered in valuing the stock were the following: the organization and history of the corporations; their capital structure, financial condition, the nature of their business, and the overall manner in which the business was operated; the number of outstanding shares of each class of Cascade Olympic's stock and identity of the shareholders; the fact that Cascade Olympic's shares were not listed on any exchange, were not dealt with through brokers or in over-the-counter trading, and had not been the subject of any sales; the character and amounts of Cascade Olympic's assets and liabilities and those of the corporations in which Cascade Olympic held an *182 interest; the book value and fair market value of the underlying assets of Cascade Olympic, its affiliated corporations and BHC; and all other factors which in our view or that of the witnesses were relevant and material to the value of such stock on the alternate valuation date. Petitioner's expert witness valued the decedent's shares in Cascade Olympic at $264,000 and respondent's expert witness valued the same shares at $1,278,132 assuming a power to liquidate and $1,175,516 assuming inability to liquidate. The value determined in the statutory notice of deficiency was $1,074,990. Although opinion evidence is obviously admissible and relevant on the question of value, we must weigh such evidence in the light of the demonstrated qualifications of the experts and of all other relevant evidence of value. Anderson v. Commissioner,250 F.2d 242, 249 (5th Cir. 1957), affg. a Memorandum Opinion of this Court. Furthermore, we are not bound by the opinion of any expert witness when that opinion is contrary to our own judgment. Barry v. United States,501 F.2d 578 (6th Cir. 1974); Tripp v. Commissioner,337 F.2d 432 (7th Cir. 1964), *183 affg. a Memorandum Opinion of this Court; Kreis' Estate v. Commissioner,227 F.2d 753, 755 (6th Cir. 1955). We may embrace or reject expert testimony, whichever, in our best judgment is appropriate. Helvering v. National Grocery Co.,304 U.S. 282 (1938); Silverman v. Commissioner,538 F.2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court. In weighing the opinions of the expert witnesses, we have considered the following: their qualifications and demeanor; their familiarity with Cascade Olympic and its affiliated corporations and their assets and liabilities; the soundness of the valuation method employed; and skill employed in assembling, analyzing, and weighing supporting data. Where there is an on-going business such as we have in this case, it is inappropriate to treat the underlying asset value as the sole criterion in determining stock value. See Hamm v. Commissioner,325 F.2d 934, 941 (8th Cir. 1963), affg. a Memorandum Opinion of this Court; Estate of Andrews v. Commissioner,79 T.C. 938, 945 (1982); Portland Manufacturing Co. v. Commissioner,56 T.C. 58, 80 (1971), *184 affd. without published opinion (9th Cir. April 21, 1975). In the cases in which stock was valued solely on the basis of asset value, the corporations were, in essence, in the business of selling their assets, and thus, earnings were not a reliable indicator of value. Harwood v. Commissioner,82 T.C. 239 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986) (timber business); Estate of Huntington v. Commissioner,36 B.T.A. 698 (1937) (real estate subdivision and sales). However, the degree to which the corporation is actively engaged in producing income rather than merely holding property for investment should influence the weight to be given to earnings power and other factors as opposed to net asset value. Estate of Andrews v. Commissioner,79 T.C. at 945. In this case, the primary business of each of the corporations is the management, development and sale of real estate, and the investment in related obligations. Under these circumstances, earnings, in the form of rent, are conceded by both parties to not be a realistic gauge of the value of the stock at issue. Therefore, we believe that the *185 appropriate method of valuing the stock held by the decedent in this case is by reference to the value of the corporate assets, adjusted however for the appropriate discounts and premiums. Estate of O'Connell v. Commissioner,640 F.2d 249 (9th Cir. 1981), affg. in part and revg. in part a Memorandum Opinion of this Court; Hamm v. Commissioner,supra;Estate of Lee v. Commissioner,69 T.C. 860, 870 (1978). Both parties agree that the appropriate measure of the value of the stock of Cascade Olympic held by the decedent is the value of the underlying assets held by each of the corporations in which Cascade Olympic held an interest, adjusted for factors such as minority interests, control factors, liquidity or lack of marketability, and the structure of the corporations. Both experts reviewed the consolidated income tax returns and varying numbers of the documents supporting both the assets and liabilities of each corporation and the contested stock ownership. Neither expert contacted all relevant parties nor reviewed all relevant contracts and loan agreements. There is substantial agreement on the fair market value of the assets *186 although the discounts applied to liabilities, particularly the mortgage held on Tacoma Mall, vary widely. The primary area of disagreement between the expert witnesses of petitioner and respondent is the appropriate premiums and discounts to be applied to the value of the net assets of all of the affiliated corporations. They differ further on the value of the minority interests held in each of the relevant corporations and how to allow for the minority interests when valuing the Cascade Olympic stock at issue. Shares of stock of a corporation which represent a minority interest are usually worth less than a proportionate share of the value of the assets of the corporation. Estate of Bright v. United States,658 F.2d 999 (5th Cir. 1981) (en banc); Harwood v. Commissioner,supra;Estate of Andrews v. Commissioner,supra;Estate of Zaiger v. Commissioner,64 T.C. 927 (1975). The minority discount is recognized because the holder of a minority interest lacks control over corporate policy, cannot direct the payment of dividends, and cannot compel a liquidation of corporate assets. See Harwood v. Commissioner,82 T.C. at 267; *187 Estate of Andrews v. Commissioner,79 T.C. at 953; Drybrough v. United States,208 F.Supp. 279, 287-288 (W.D.Ky. 1962). A lack of liquidity discount, on the other hand, reflects the fact that there is no ready market for shares in a closely held corporation. Liquidity discounts and minority discounts must be determined on the basis of the shares being valued without combining those shares with the shares of affiliated parties. See Propstra v. United States,680 F.2d 1248 (9th Cir. 1982); Estate of Lee v. Commissioner,supra."For purposes of valuation, one should construct a hypothetical sale from a hypothetical willing seller to a similarly hypothetical willing buyer," regardless of the fact that "the reality of the situation may be that the stock will most probably be sold to a particular party or type of person." Estate of Andrews v. Commissioner,79 T.C. at 955-956. However, "the hypothetical sale should not be constructed in a vacuum isolated from the actual facts that affect the value of the stock in the hands of decedent * * *." 79 T.C. at 956. Applying these standards to *188 the facts at issue, the decedent was the owner of a majority interest only in Cascade Olympic, and did not hold sufficient voting power even in Cascade Olympic to liquidate the corporation without the assistance of shares held by other parties. Wash. Rev. Code Ann. secs. 23A.20.030 and 23A.28.030 (1969). However, because the decedent's majority interest in the voting shares of Cascade Olympic enabled him to control the board of directors of Cascade Olympic, he could direct Cascade Olympic to vote for the liquidation of Capital Cascade or its merger into Cascade Olympic. Wash. Rev. Code Ann. secs. 23A.08.370 and 23A.08.380 (1969). As there were minority interests in each of the corporations other than the interest of the decedent or Cascade Olympic, fiduciary constraints would limit such actions. We find, however, that there were no plans as of the alternate valuation date to liquidate or merge any of the corporations into any of the other corporations. Further, as of that date, there were valid business reasons to affirmatively avoid any such action because such action would expose those assets to the uncertainty of the liability exposure of Capital Cascade. Respondent and *189 his expert argue that no business purpose for the complex corporate structure headed by Cascade Olympic was presented and that the corporations must be viewed as essentially one economic entity. The corporate structure selected by a taxpayer is generally respected absent fraud, alter ego situations, or other circumstances not present here. Moline Properties, Inc. v. Commissioner,319 U.S. 436 (1943). Disregarding the corporations' individual status is not lightly done. Petitioner has presented ample justification for the decision to hold the various assets and particularly the contingent liabilities within separate corporate structures. Further, respondent has failed to note that all of the corporations at issue had minority shareholders whose interests would not necessarily be met by either a liquidation or a merger of their corporations resulting in a change in the form and nature of their investment. Respondent's philosophical objection to the complexity of the intercorporate relationships in this case cannot justify the decision of his expert to, in essence, disregard this structure merely because it makes the valuation more complex. Respondent's expert *190 valuation of the Cascade Olympic stock held by the decedent proceeds, however, from this preliminary decision to treat all of the corporations as one consolidated corporation rather than as a group of corporations. He used the financial statements of each corporation for the taxable year 1979, the most current financial information available, to estimate the fair market value of all assets and all liabilities. These values were netted to obtain an adjusted fair market value for the net assets of each corporation. The value of the minority interests in the non-stock assets and liabilities of each of the corporations was then subtracted. The manner of accounting for the minority interests failed, however, to subtract the value held by the minority shareholders in each corporation consisting of the stock of one of the other members of the affiliated group and BHC. Various discount factors, including a discount of 20 percent for the complicated ownership structure, were then applied to arrive at the final estimate of the adjusted fair market value as of the alternate valuation date of the Cascade Olympic stock held by the decedent. In essence, respondent's expert assumes that the *191 corporate structure actually in existence has been collapsed in order to facilitate the computations necessary to determine the value of the stock at issue. Respondent's expert relied, to a large extent, upon the materials in respondent's files which were incomplete. He met with company management only once and was virtually unaware of the importance of the decedent to Cascade Olympic and its subsidiaries. The adjustments made to the book value of the assets and liabilities appeared to depend more upon a general approach toward mortgages and promissory notes than a particularized inquiry as to the nature of the item before him. For example, the mortgage on Tacoma Mall was discounted from $1.8 million to $1.3 million on the assumption that its low interest rate would result in a willingness by the lender to not only waive prepayment penalties but also accept a prepayment at less than book value. Respondent's expert failed, however, to learn that the mortgagee refused to accept any change in terms. A further failing in respondent's expert's valuation is discounting the value of the Preferred A and Preferred B shares of Cascade Olympic not held by the decedent by approximately *192 99 percent, to an amount below par value, because of the lack of control held by minority shareholders of Cascade Olympic, resulting in a corresponding increase in value of the common shares held by the decedent. This discount ignores the par value of $100 which was the minimum amount to be received by each owner of Preferred A and Preferred B upon liquidation absent bankruptcy. This methodology places a far higher value upon the common stock than can be justified. Respondent's expert did not review the subscription agreement between Thousand Trails and BHC, and yet he valued the Thousand Trails' subscription obligation as equivalent to an easily transferrable medium grade corporate bond. Respondent's expert then applied a lower than market discount rate despite a concession at trial that it would have been difficult to sell the obligation on the open market without further discount. In a similar fashion, many of the obligations held by the various corporations were not discounted on the basis of a knowledge of their terms nor on the basis of whether they were current, nor were appropriate interest rates always used for the discounting to the alternate valuation date. On the *193 other hand, we find that we are unable to rely totally on the opinion of petitioner's expert. He also relied heavily on company management and its advisors to supply him with the correct data without further personal verification. The financial statements and income tax returns of Cascade Olympic reflected 521 outstanding shares of Class B preferred stock. Yet petitioner's expert assumed for purpurses of his report that there were 591 shares outstanding, presumably from information he obtained from corporate management. Although he reviewed more of the underlying documentation than did respondent's expert, the values selected for the assets and liabilities were, in some instances, based upon assumptions rather than fact. Further, in the examination of the Bethel project liabilities, much of the information relied upon was unknown on the alternate valuation date. His method of valuation in general, however, is a far better reflection of the fair market value of the shares of Cascade Olympic held by the decedent under the corporate structure that actually existed. His use of simultaneous, interdependent equations, although complex, accounts for the inter-relationships of the corporations *194 and the value of the minority interests not only in the non-stock assets but also in the stock ownership of the affiliated corporations. The final valuation figure selected for petitioner's interest in Cascade Olympic was, however, heavily dependent upon the expert's description of Cascade Olympic as a closed-end investment company with investments in a number of other corporations. He applied a discount of 45 percent to the value of the Cascade Olympic shares due to this view of the structure of the company. A portion of this discount was also due to the importance of the decedent to the operations of the corporations. An additional discount was applied for the effect of capital gains tax payable by the shareholders of BHC, although transaction costs are not ordinarily considered when no liquidation or merger was, in fact, anticipated. Estate of Andrews v. Commissioner,79 T.C. at 942; Estate of Piper v. Commissioner,72 T.C. 1062, 1086-1087 (1979); Estate of Cruikshank v. Commissioner,9 T.C. 162 (1947). Appropriate adjustments were made for lack of liquidity. We have pointed out above the defects of the approaches used *195 by the experts of both parties. Having taken diametrically opposed views as to the factors to be weighed in valuing the stock involved in this case, the parties "failed successfully to conclude settlement negotiations -- a process clearly more conducive to the proper disposition of disputes such as this." Messing v. Commissioner,48 T.C. 502, 512 (1967). Because we have concluded that there are basic flaws in the valuations offered by both of the experts, we must necessarily make our best judgment of value. While we have considered both of the valuation reports, we have also weighed all other relevant factors shown in the record. We have accepted the valuations placed on the underlying assets and liabilities by petitioner's expert to a large degree, but have applied the appropriate discounts for the restricted marketability of the shares and the lack of control held by Cascade Olympic in a number of the affiliated companies holding a number of the underlying assets. The closed-end investment company discount has been removed although we have retained a 10 percent discount for the effect of the death of the decedent upon the management of the corporations. We have *196 also adjusted the valuation to allow for our factual finding that only 521 shares of Preferred B were outstanding upon the alternate valuation date. Based upon all of these facts and upon the entire record, we conclude and find as a fact that the fair market value of the shares of Cascade Olympic held by the decedent as of the alternate valuation date was $3,395 per share for a total fair market value of $509,250. The second issue for decision is whether decedent held an interest in the shares of Cascade Olympic and Capital Cascade in the name of his surviving spouse, Jean Manning. In determining the nature and extent of decedent's community interest in these shares, this Court must look to the laws of the State of Washington where the decedent and Mrs. Manning resided throughout their marriage. Katz v. United States,382 F.2d 723 (9th Cir. 1967). Under the laws of the State of Washington, all property acquired after marriage by either husband or wife or both, is presumed to be community property. Wash.Rev. Code Ann. sec. 26.16.030 (1986). While the presumption is rebuttable, the burden rests upon the spouse asserting the separate *197 character of the property acquired by purchase during the marriage to establish his or her claim by clear and satisfactory evidence. Berol v. Berol,37 Wash. 2d 380, 223 P.2d 1055, 1056 (1950). Indefinite evidence that certificates of stock issued in one spouse's name were intended to be separate property is also insufficient to rebut the presumption. In re Wheeler Estate,123 Wash. 531, 212 P. 1043 (1923). In this case, however, we find the testimony of Mrs. Manning regarding events occurring over 15 years before trial to be credible and sufficient to rebut the presumption. We find that the 10 shares of Cascade Olympic stock acquired by her in 1965 were a gift to her by the decedent and that the 660 shares of Capital Cascade stock acquired by her in 1969 were purchased with separate funds. All of the shares of Cascade Olympic and Capital Cascade stock held in the name of Mrs. Manning were, therefore, separate property and decedent had no interest in the shares at the time of his death. Decision will be entered Under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect at the date of the decedent's death, and all Rule references are to the Rules of Practice and Procedure of this Court.↩
2. Most of these corporations began existence under another name now held by another of the affiliated corporations. We will refer to each of these corporations solely by its legal name during the period relevant to this case.↩
3. Since 1981, Center Offices has been inactive.↩
4. There is no explanation of the discrepancy between the 510 shares described in the statutory notice and the 660 shares which respondent concedes were owned by Mrs. Manning.↩